363 A.2d 1345.

JAMES NAUGHTON *et al vs.* DR. CHARLES H. GOODMAN *et al.*

OCTOBER 5, 1976.

PRESENT: Bevilacqua, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. The Rhode Island Department of Mental Health, Retardation and Hospitals (M.H.R.H.), through its Director, is before us on its appeal from a 1974 decision[1] of the Family Court directing it to assume the ex-

---

[1] The respondent Goodman, who at the time of this litigation was the Director of the Department of Mental Health, Retardation and Hospitals, filed an appeal after his receipt of the trial justice's decision but before the entry of a decree which embodied all of the findings and orders of the decision. We will overlook this deficiency but point out, as we have on prior occasions, that, when dealing with equity, appeals are taken from decrees rather than the trial justice's decision. *LaMarche* v. *LaMarche,* 108 R. I. 213, 215, 273 A.2d 860, 861 (1971).

penses of treating the petitioners' 18-year-old autistic child, Timothy, at the Behavioral Research Institute (B.R.I.), a day care center which specializes in the treatment of persons having serious behavioral disorders. The cost of treatment at B.R.I. is $16,000 a year.

Before we proceed to the merits of the appeal, a brief chronological sketch of Timothy's parents' search for a proper treatment facility to serve their son's needs is in order. The Naughtons live in the town of Cumberland, where Timmy attended special education classes in the public schools up until his twelfth birthday. Between the ages of 12 and 14 he lived in Gloucester at a residential treatment center, from which he was discharged because of a lack of educational progress. He returned home and to the Cumberland school system, but after several months the destructiveness and aggressiveness of his frequent tantrums became so dangerous that he left school and was assigned to the Adolescent Unit of the Institute of Mental Health (I.M.H.), which is a division within M.H.R.H. While residing at the Unit, Timmy attended several daytime special education programs. In all instances, however, he was expelled because of repeated uncontrollable tantrums and other inappropriate behavior.

On October 18, 1973, at the age of 16, he began a 4-week trial attendance at B.R.I. day school. B.R.I. is a private, nonprofit organization which is located in Providence. It specializes in the treatment and education of severely disordered personalities. Timmy's placement at B.R.I. was the result of a law suit brought by his parents in the Superior Court against the Town of Cumberland. This litigation did not reach the trial stage because the town, acknowledging Timmy's needs but asserting its lack of responsibility to meet them, agreed to fund a trial program at the institute. Despite a solid record of accomplishment and results at B.R.I., Timmy could not return to this

facility because Cumberland's budget could not find the necessary $16,000 to pay B.R.I.'s cost of treatment. Moreover, M.H.R.H. refused to come to Timmy's aid because of its belief that he was not an emotionally disturbed child.

The Cumberland School Committee suggested to Timmy's parents that he be placed in a new program. However, they were convinced that the committee's proposal was unsuitable and that another change of schools was inadvisable. Consequently, they instituted this suit in the Family Court, and in September of 1974 a trial justice ruled that Timmy was emotionally disturbed as that term is defined in G. L. 1956 (1969 Reenactment) ch. 7 of title 40.1 and directed M.H.R.H. to fund Timmy's attendance at B.R.I. to the extent required by §40.1-7-7.

A survey of Rhode Island statutes indicates that on February 26, 1970, an executive order was issued by the then Governor of this state whereby the Department of Mental Health, Retardation and Hospitals was established and charged with the responsibility of assuming and carrying out certain responsibilities formerly exercised by the Directors of Health and Social Welfare in relation to the Office of Mental Retardation, the Division of Curative Services, the Division of Business Services, and the mental health law. The chief executive's action was based on the Reorganization Act of 1969, P. L. 1969, ch. 134. Later, in 1971, the General Assembly added to M.H.R.H.'s responsibilities and obligations by instituting a new program for the care and treatment of "emotionally disturbed children," P. L. 1971, ch. 89, which is now known as ch. 7 of title 40.1.

The Legislature has left no doubt as to what it meant by the "care and treatment" of "emotionally disturbed children." Section 40.1-7-4(1) defines "care and treatment" as meaning:

"[M]edical and psychiatric care, medical attention, nursing and medications as well as food, clothing and maintenance, psychological, social work and recreational services and those educational services furnished to a child *other than those regular or special education programs under the jurisdiction of the board of regents for education.*" (Emphasis added.)

An "emotionally disturbed child" is defined in §40.1-7-4(5) as:

"[A]ny person under the age of twenty-one (21) years, and who has been diagnosed and judged by the examining physician to be in need of psychiatric *care and treatment.*" (Emphasis added.)

Other sections of ch. 7 delineate the powers and duties of administering this program.

The former Clinical Director of the Adolescent Unit at I.M.H. appeared at the hearing in Family Court. He told the trial justice that he and a team of physicans had diagnosed Timmy as being moderately mentally retarded and that his emotional problems stemmed from the frustration he experiences as he seeks to learn. Consequently, he and the staff of M.H.R.H. did not consider Timmy as emotionally disturbed and, therefore, he was, in their opinion, not eligible for the treatment prescribed by ch. 7. On the other hand, Timmy's physician testified and left no doubt that, in his opinion, his patient was emotionally disturbed.

The differences of opinion expressed by the medical experts who appeared at the trial court are of no moment because the fact is that the Legislature applied a broad brush as it defined an "emotionally disturbed" child as one needing "psychiatric care and treatment" and specifically included within the definition of "care and treatment" psychological services, psychiatric care and educational services other than those which may be furnished by the Board of Regents. Whether or not Timmy's medi-

118

cal condition is more accurately defined in the scientific lexicon as "mentally retarded" as opposed to "emotionally disturbed" is irrelevant to the proper application and interpretation of the statute. The crucial issue for an examining physician is whether or not the patient is in need of psychiatric care and treatment as defined by the statute, and if he or she is, the patient is "emotionally disturbed" and comes within the statute.

Although Timothy is for the purposes of ch. 7 emotionally disturbed, his parents are in the wrong forum because the Family Court is powerless to act in such matters. M.H.R.H. is unquestionably a "state agency." There is no doubt but that the dispute between the parents and the division as to Timmy's status is a "contested case." When one has a "contested case" with a "state agency," the proper vehicle by which judicial assistance is usually invoked in such circumstances is by way of the Administrative Procedures Act, ch. 35 of title 42. Since M.H.R.H. is not one of those agencies exempted from the operations of the Act, the court which has initial jurisdiction in this area is the Superior Court rather than the Family Court.

In holding that the Family Court did not have the power to issue the order that it did, we would repeat what has been said time and time again. The Family Court is a court of limited jurisdiction. In fact, on three different occasions during this present term we have emphasized that the Family Court may only exercise such power as has been expressly conferred upon it by the General Assembly. *Concannon* v. *Concannon*, 116 R.I. 323, 330, 356 A.2d 487, 492 (1976); *Ryan* v. *DeMello*, 116 R.I. 264, 266, 354 A.2d 734, 735 (1976); *Castellucci* v. *Castellucci*, 116 R.I. 101, 352 A.2d 640 (1976). It also follows that the question of jurisdiction over the subject matter is an issue which can be raised at any time either by the litigants or by the

court sua sponte. *Ryan* v. *DeMello; Castellucci* v. *Castellucci,* both *supra.*

Admittedly, §14-1-5(a) gives the Family Court exclusive jurisdiction in proceedings where any child is "(1) delinquent, (2) wayward, (3) dependent, (4) neglected, or (5) mentally defective or mentally disordered." It is clear that this statute gives the Family Court jurisdiction only when the person before the court is a child whose conduct is such that the court must take appropriate action against her or him. In seeking to determine the court's power to deal with the mentally defective or mentally disordered child, we must recall that the Family Court in actuality is an entity which the General Assembly created in 1961 to deal with matters affecting the family unit, and in pursuance of this objective the Legislature conferred upon the Family Court the power that had been previously exercised by either the Juvenile Court or the Domestic Relations Division of the Superior Court. *State* v. *Zittel,* 94 R. I. 325, 328-29, 180 A.2d 455, 457 (1962). When the Juvenile Court was established in 1944, it was given jurisdiction over the mentally defective or mentally disordered juvenile. Public Laws 1944, ch. 1441, §14(a)(5). The court was specifically authorized to determine all cases involving juveniles under the age of 18 that had previously been heard by any court pursuant to the provisions of G. L. 1938, ch. 65. Chapter 65 and its predecessors were written in a not-too-enlightened age when the court spoke of "feeble-minded" persons and the District Court's power to commit such individuals to the "Exeter School." Today Exeter School is called the Dr. Joseph H. Ladd School, and it serves the "mentally retarded." Again, in the mid-forties a justice of the District Court could, upon presentation of a complaint in writing that a person was "insane" and a threat to the people's peace and safety together with a properly

prepared certificate signed by two physicians, commit such a person to "Butler Hospital" or the "State Hospital for Mental Diseases." General Laws 1938, ch. 71, §§1 and 2. The words "insane person," when used in G. L. 1938, were to be construed as including "every idiot, person of unsound mind, lunatic and distracted person." General Laws 1938, ch. 309, §6, now G. L. 1956 (1970 Reenactment) §43-3-7, where this rule of construction remains on our statute books.

It is obvious that the reference to the "mentally defective or mentally disordered" actually means those juveniles who must of necessity be institutionalized by way of a commitment order issued by the judiciary. This particular language affords no basis whereby the Family Court can entertain a suit such as the one initiated by Timmy's parents.

In vacating the decree entered in the Family Court, we suggest to the petitioners that they proceed directly to M.H.R.H. and present their case to the appropriate officials. We would also point out to the state agency that since it has now been in business for over 5 years, it should formalize and adopt rules of practice pursuant to the terms of §§42-35-2, 42-35-3, and 42-35-4 so that others like the petitioners will know the route and procedures to be followed should they seek to assist their emotionally disturbed children.

The respondents' appeal is sustained,[2] the decree appealed

---

[2]Other respondents in this litigation include various Cumberland officials, including the school committee. Section 40.1-7-7 specifically requires the community in which an emotionally disturbed child resides to share in the expense of programs other than the regular or special education programs conducted under the aegis of the Board of Regents for Education. Cumberland estimated its share of the $16,000 that would be due B.R.I. as being somewhere between $700 and $800. The town had agreed to pay this sum in the event that the Family Court's decree was upheld.

from is vacated, and the cause is remanded to the Family Court with a direction to dismiss the petition without prejudice to the petitioners' right to proceed pursuant to the Administrative Procedures Act.

*Oster, Espo, Fay & Groff, Irving N. Espo,* for petitioners.

*Julius C. Michaelson,* Attorney General, *Forrest Avila, Richard B. Woolley,* Special Asst. Attorneys General, for respondents.