390 A.2d 390.

## IN RE JOHN DOE, *a juvenile.*

AUGUST 31, 1978.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

Weisberger, J.    This is a petition for certiorari to review a decree of a justice of the  Family Court, finding Dr. Joseph Bevilacqua, the Director of the Rhode Island Department of Mental Health, Retardation and Hospitals (director), in contempt of that court for failure to place John Doe,[1] a juvenile, in a particular psychiatric facility, namely, the Elmcrest psychiatric Institute located in Portland, Connecticut, at an approximate cost of $65,000 per year. Representatives of the Department of Mental Health, Retardation and Hospitals (MHRH) had previously determined that John Doe was eligible for residential treatment as an emotionally disturbed child pursuant to the provisions of G.L. 1956 (1977 Reenactment) chapter 7 of title 40.1, after a referral by another justice of the Family Court. The facts are largely undisputed and disclose a tragic pattern of events leading to the present controversy.

At the time of entry of the contempt order, John Doe was 17 years old. In 1972, at age 11, he had been referred to Child Welfare Services because of abuse by his father. He was placed in an emergency shelter foster home. He ran away from the foster home shortly after placement and

---

[1]The pseudonym is used in order to protect the confidentiality of the juvenile's identity.

returned to his mother. A few days later, he was detained at the Children's Center by order of the Family Court. He ran away several times from this facility and ultimately returned to his mother with permission of the court. Thereafter, over a period of 5 years, the young man engaged in a variety of activities demonstrating wayward and delinquent behavior which caused him to be confined intermittently at the Rhode Island Training School for Boys. These confinements were interspersed with intervals of placements at a number of private institutions, including Avalon School at Great Barrington, Massachusetts. He left Avalon School after doing considerable damage on May 28, 1974, and was then placed at Whitmarsh House in Providence. He seemed to do quite well at this facility for a substantial period, until he renewed his course of running away and committing violations of law during the year 1976. He was then sent to the Youth Correctional Center at the Rhode Island Training School, and on October 29, 1976, he was referred by Child Welfare Services to Mental Health Services for Children and Youth. Through the intervention of MHRH, he was admitted to the Browndale School treatment facility in Granby, Massachusetts, on March 4, 1977. He appeared to make a reasonable adjustment at this establishment, although he was charged with a breaking and entering incident soon after his arrival. However, his residence was terminated when he stabbed a member of the staff of that institution and as a result was charged with assault with a dangerous weapon in Massachusetts. While a future course was being determined, John was returned to the Youth Correctional Center on June 17, 1977.

After further psychiatric evaluation, it was determined that John could not function in an open setting such as that furnished in Browndale, but that he would need a more structured or secure setting in order to curb his antisocial "acting out" behavior.

Ultimately, representatives of MHRH identified the Elmcrest facility as a suitable therapeutic setting. A justice of the Family Court ordered that John be placed in that facility.

Meanwhile, he was retained at the Youth Correctional Center with periodic visits from Dr. Louis Sorrentino, a psychiatrist, on a semi-weekly counseling and case-conference basis.

John was placed on the waiting list for the Elmcrest facility in Connecticut. Notification of this placement was sent to a justice of the Family Court with an indication that there would be a wait of approximately 4 weeks, during which the juvenile would be seen regularly by Dr. Sorrentino at the Youth Correctional Center. Meanwhile, John escaped on more than one occasion from the Youth Correctional Center in late 1977 and early 1978 and was active in several incidents involving a stolen car, breaking and entering and a high-speed chase by the police.

On February 24, 1978, representatives of MHRH received notice that Elmcrest Psychiatric Institute had a vacancy available for John, but by this time the $4,000,000 budget of MHRH for providing services for emotionally disturbed children had been exhausted. Therefore, officials of the department declined to place John. It was as a result of this refusal to place the juvenile because of budgetary deficiencies that the director was held to be in contempt of court.

An examination of the voluminous record of this young man in the Family Court discloses that there have been a number of mental health evaluations. There does not appear to have been any specific diagnosis of psychotic condition. A recent evaluation of his neurological condition indicates that there is no neurological disorder. He was found eligible in December 1976 for treatment by representatives of MHRH. One would infer from these evaluations that the subject individual is an aggressive youth who might be classified either as a socio-pathic personality or one suffering from a personality or character disorder. Since he has been found eligible for treatment as an emotionally disturbed individual, he would undoubtedly meet the very broad test of the Rhode Island statute. An emotionally disturbed child is defined in §40.1-7-4(5) as follows:

"[A]ny person under the age of twenty-one (21) years, and who has been diagnosed and judged by the examining physician to be in need of psychiatric care and treatment."

The director's brief suggests that there are presently about 184 emotionally disturbed children who are being provided with services under this program at an average cost of more that $22,000 per year each. Because of the fiscal constraints, the names of children found qualified to participate in the program are placed upon a waiting list which advances slowly as vacancies occur. When the appropriation has been expended for a given fiscal year, there has sometimes been an expenditure over budget, but in this instance it was determined that no further expenditures in excess of the appropriation could be made. The issue presented by this case is whether the director may be held in contempt of court for failure to expend funds for the treatment of an emotionally disturbed young person in excess of the appropriation which has been made by the Legislature for this purpose.

In confronting this issue, it may be helpful to review the case law with respect to statutory and constitutional rights to treatment for the mentally ill and the emotionally disturbed.

Either statutory or constitutional rights to treatment have been recognized in a number of cases in which a person or persons were incarcerated or committed for allegedly therapeutic purposes. *Rouse* v. *Cameron*, 373 F.2d 451 (D.C. Cir. 1966); *Welsch* v. *Likins*, 373 F. Supp. 487 (D. Minn. 1974); *Stachulak* v. *Coughlin*, 364 F. Supp. 686 (N.D. Ill. 1973); *Nason* v. *Superintendent of Bridgewater State Hospital*, 353 Mass. 604, 233 N.E.2d 908 (1968). Generally the foregoing cases assert the proposition that if one is incarcerated for therapeutic purposes, treatment must be given or the person must be released. Perhaps the most comprehensive recognition of a constitutional right to treatment was given by the Fifth Circuit Court of Appeals in *Wyatt* v. *Aderholt*, 503 F.2d 1305 (5th Cir. 1974), in which the court was reviewing a series of decisions by the District Court for the Middle

District of Alabama[2] concerning adequacy of treatment given in Alabama mental institutions in a civil rights action wherein injunctive relief was sought. The principles enunciated in *Wyatt* had been earlier set forth in *Donaldson* v. *O'Connor*, 493 F.2d 507 (5th Cir. 1974), wherein the Fifth Circuit Court of Appeals was reviewing an award of damages in favor of a former inmate of a Florida state hospital who had been involuntarily confined for nearly 15 years without receiving any significant medical treatment. In both of these cases the Fifth Circuit held in effect that civilly commited mental patients had a constitutional right to such individual treatment as would help each of them to be cured or to improve his or her mental condition.

However, on review by the Supreme Court of the United States, the Fifth Circuit's rationale of a constitutional right to treatment in *Donaldson* was not the ground upon which liability was predicated. In *O'Connor* v. *Donaldson*, 422 U.S. 563, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975), the Supreme Court limited its holding to the narrow ground that a state could not constitutionally confine, without more, a nondangerous individual who was capable of surviving safely outside the institution on his own or with the help of family members or friends. The Court did not choose to pass upon the existence vel non of a constitutional right to treatment. In a concurring opinion, Chief Justice Burger pointed out the dangers in that proposed constitutional doctrine. He recognized that although there were certain due process limitations on the parens patriae power, such limitations would not justify the further conclusion that the power may be exercised to confine a mentally ill person only if the purpose of the confinement is treatment. He pointed out the difficulty of predicting the outcome of psychiatric treatment in the present state of the art.

---

[2]*Wyatt* v. *Stickney,* 344 F. Supp. 373 (M.D. Ala. 1972); *Wyatt* v. *Stickney,* 344 Supp. 387 (M.D. Ala. 1972); *Wyatt* v. *Stickney,* 334 F. Supp. 1341 (M.D. Ala. 1971); *Wyatt* v. *Stickney,* 325 F. Supp. 781 (M.D. Ala. 1971).

"Despite many recent advances in medical knowledge, it remains a stubborn fact that there are many forms of mental illness which are not understood, some which are untreatable in the sense that no effective therapy has yet been discovered for them, and that rates of 'cure' are generally low. See Schwitzgebel, The Right to Effective Mental Treatment, 62 Calif. L. Rev. 936, 941-948 (1974). There can be little responsible debate regarding 'the uncertainty of diagnosis in this field and the tentativeness of professional judgment.' *Greenwood v. United States*, 350 U.S. at 375. See also Ennis & Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, 62 Calif. L. Rev. 693, 697-719 (1974). Similarly, as previously observed, it is universally recognized as fundamental to effective therapy that the patient acknowledge his illness and cooperate with those attempting to give treatment; yet the failure of a large proportion of mentally ill persons to do so is a common phenomenon." *Id.* at 584, 95 S. Ct. at 2498, 45 L. Ed. 2d at 412.

In one of the articles cited by Chief Justice Burger, *The Right to Effective Mental Treatment*, 62 Cal. L. Rev. 936, 946-47 (1974), Ralph K. Schwitzgebel, a lecturer on psychology at the Harvard Medical School, refers to a number of empirical studies and concludes as follows:

"Thus, the evidence for the effectiveness of traditional psychotherapeutic methods for the reduction of antisocial behavior is not very persuasive. In fact, the evidence in some studies points toward increased antisocial or maladaptive behavior with treatment. A study by Miller and Kenny examined the post-hospital adjustment of 175 adolescents who had been referred to the hospital by courts and others for antisocial conduct such as robbery, vandalism, truancy, and sexual offenses. After periods of hospitalization ranging from two weeks to five months, the youths were released into the community. During a six-month follow-up period, those

youths who refused to participate in mental health programs following release were subsequently institutionalized less often than those who participated in these programs. The investigators concluded that '[t]o date, there is nothing in the literature or practice to tell us how and no one has ever demonstrated that problems of delinquency can be successfully treated on a large scale in a psychiatric facility. We cannot treat misbehavior.' In other studies, the groups receiving traditional forms of psychotherapy have shown more recidivism, maladaptive behavior, and psychoneurotic symptoms than the control groups not receiving the treatment."

A pertinent observation has been made by Hervey Cleckley, M.D., in *The Mask of Sanity* at 477-78 (4th ed. 1964).

"For a while I had hoped that long-term treatment might be more effective if the patient could be induced voluntarily or constrained by commitment procedures to remain with the therapist for enough time to give his methods a thorough and adequate trial. I am no longer as hopeful that any methods available today would successful with typical sociopaths. I have now, after more than two decades, had the opportunity to observe a considerable number of patients who, through commitment or the threat of losing their probation status or by other means, were kept under treatment not only for many months but for years. The therapeutic failure in all such patients observed leads me to feel that we do not at present have any kind of psychotherapy that can be relied upon to change the psychopath fundamentally.

"* * *

"I wish I could be optimistic about the accomplishments of psychiatry in treating and curing the psychopath. Some spokesmen for mental hygiene movements and for greater extensions of psychiatric influence tend to credit us, I fear, with far more power and effective-

ness than we have really attained. Hundreds of millions of dollars are being spent to promote mental hygiene and psychiatric care. Many seem to believe that if we only had enough psychiatrists, or enough dynamically oriented psychiatrists, all problems of mental health, crime, and delinquency could be solved. This claim is seldom made directly in such absolute terms, but the implication plainly underlies many eloquent appeals for more and more funds from the state and federal governments."

The foregoing observations by the Chief Justice and by experts in the fields of psychology and psychiatry would indicate that the prognosis of those who have been subjected to psychiatric intervention for behavior problems is most guarded indeed. Although our Legislature had determined that a program of purchase of services for emotionally disturbed young people will be implemented by the director, it has chosen to limit that program by a financial ceiling of $4,000,000. In view of the highly debatable efficacy of such a program, we find no basis to determine that there is a constitutional right which would require the Legislature or the director to provide such services at unlimited annual expense for an individual whose condition may or may not be effectively improved thereby.[3]

In *State in Interest of D.F., a Juvenile,* 145 N.J. Super. 381, 367 A.2d 1198 (1976), the appellate division commented upon the financial considerations which required the setting of priorities by the New Jersey Department of Institutions and Agencies in determining which of the thousands of needy juveniles woule be the best candidates for extremely expensive out-of-state psychiatric facilities. The court described such facilities as "well beyond the financial capability of all but the most wealthy." In that case the annual expense was $40,000, where here it approximates $65,000. It would not

---

[3]We reserve for future determination whether a constitutional right to treatment exists even in areas where prognosis is relatively certain.

be consonant with economic reality and common sense to hold that every delinquent juvenile should be entitled to residential treatment at such a level without regard to fiscal limitations.

Counsel for the juvenile has cited *Inmates of Boys' Training School* v. *Affleck*, 346 F. Supp. 1354 (D.R.I. 1972), as authority for the proposition that there is a constitutional right to rehabilitative treatment whenever a juvenile offender has been incarcerated. There is no question that this case holds that there is a constitutional right to minimal basic facilities and amenities on the part of those juveniles who are committed for purposes of protecting society against their antisocial acts, as well as for other purposes. Not only is there a constitutional right to certain basic rights incident to rehabilitation, but Rhode Island has by statute specifically adopted rehabilitation as its goal. General Laws 1956 (1969 Reenactment) §14-1-2 provides:

> "[T]he purpose of this chapter is to secure for each child under its jurisdiction such care, guidance and control * * * as will serve the child's welfare and the best interests of the state; * * * and, when such child is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parent."

Nevertheless, the rehabilitative goal does not mandate that antisocial behavior be treated without regard to expense or the availability of appropriated funds in a context, where as here, according to prior psychiatric evaluations, the prognosis is guarded and the outcome is doubtful.

In the opinion of the court, the appropriate rule to adopt in such cases is enunciated in *State in Interest of D.F., a Juvenile, supra,* where the court dealing with similar provisions, determined that the Division of Youth and Family Services of the New Jersey Department of Institutions and Agencies should have the right to determine which private institutions are within its budgetary capabilities. Although a

court may refer a juvenile to the appropriate state agency for treatment, the court does not have the authority specifically to select a given facility. The setting of priorities among those who are deemed to be suitable candidates for treatment is most suitably performed by the administrative agency rather than by a court. A court must limit its adjudication only to the parties who are actually before it, and thus its perspective cannot include the needs and demands of persons who are not represented in the controversy immediately at issue. Unfortunately, where a court may order a large sum to be expended, particularly if it should require transfers from other items in a comprehensive budget, it is impossible to perceive the ramifications of such a decision. An agency such as MHRH has the responsibility of allocating scarce resources among myriads of competing requirements and is constituted to perform such a function. A court is simply not constituted by its inherent nature to achieve the required breadth of focus. For this reason, the general assembly in §40.1-7-5 placed the responsibility for development of the public policy and programs related to the needs of emotionally disturbed children in the director of MHRH, rather than in a court. It is true that by virtue of §8-10-3, as amended by P.L. 1977, ch. 89, §1, the Legislature has given the Family Court jurisdiction to review the decisions of MHRH in contested cases involving juveniles, thus modifying our holding in *Naughton v. Goodman*, 117 R.I. 113, 363 A.2d 1345 (1976). However, the court under the provisions of §42-35-15 is still not allowed to substitute its judgment for that of the agency as to weight of evidence on questions of fact. In any event, the legality of the order of the Family Court requiring the director to place this juvenile in the selected facility is not before us, since no appeal was taken from that order. The invalidity of the placement order would not excuse a lack of compliance therewith until it was stayed, modified or set aside on review. *Menard v. Woonsocket Teachers' Guild # AFT 951*, 117 R.I. 121, 363 A.2d 1349 (1976).

In the case at bar, there is no question that the representatives of MHRH determined that the juvenile was emotionally

disturbed and that he would benefit from a placement at the selected facility. However, that placement could not be made because of exhaustion of the budgeted monies at the director's disposal for this purpose. We are of the opinion that the Family Court exceeded its authority in holding the director in contempt for not overexpending his budget or transferring funds from other portions of his budget. In this highly debatable area, the judgment of the Legislature concerning the amount which should be expended is conclusive. The annual budget adopted by the Legislature is in statutory form and has all the force of law. To hold that a director not only may exceed his budget for highly expensive out-of-state treatment but must do so under pain of contempt is not supported by any of the cases cited by counsel for the juvenile, nor is such a proposition supported by any cases which our research has disclosed.[4]

Generally the authority of a public official to expend public funds or to bind the government which he represents by contract, express or implied, is dependent upon the existence of a valid appropriation by the Legislature. *See Sutton v. United States*, 256 U.S. 575, 41 S. Ct. 563, 65 L. Ed. 1099 (1921); *State ex rel. Hudson v. Carter, 167 Okla. 32, 27 P.2d 617 (1933); Dickinson v. Edmondson*, 120 Ark. 80, 178 S.W. 930 (1915); Annot., 91 A.L.R. 1511 (1934); Annot., 19 A.L.R. 408 (1922); 63 Am. Jr. 2d *Public Funds* §45 at 434-35 (1972), and cases cited therein. Our court has also enunciated the principle that "neither the General Treasurer nor any executive officer of the State can incur any debt which will bind the State, and so become a State debt, except in so far as his action creating it is authorized by law." *In re The Incurring of State Debts*, 19 R.I. 610, 611, 37 A. 14, 14-15 (1896).

---

[4]We have just answered a certified question from the United States District Court for Rhode Island in *Roe v. Affleck*, 390 A.2d 361 (1978), wherein we held that the Director of MHRH was not required to exceed his budget in order to provide treatment for emotionally disturbed children.

The appropriation bill for the fiscal year ending June 30, 1978, P.L. 1977, ch. 200, §6, does provide for transfer of excess funds in any appropriation item for the support of any department or agency to any other item. This authority is vested, however, not in the directors of each department, but in the Director of Administration, with the approval of the Governor. Thus, the director of MHRH would not have the authority to effect such a transfer of funds within his own budget on his own authority. Consequently, the director had no authority to overexpend his budget. The Family Court's determination that his failure to do so constituted contumacious conduct was erroneous.

For the reasons stated, the decree of the Family court holding the director in contempt is hereby quashed. The case is remanded to the Family Court with our decision endorsed thereon.

*Julius C. Michaelson,* Attorney General, *Forrest L. Avila,* Special Assistant Attorney General, for Dr. Joseph Bevilacqua, Director of the Department of Mental Health, Retardation and Hospitals.

*Betsy E. Grossman,* Rhode Island Legal Services, Inc., for John Doe, *Richard P. D'Addario,* Guardian Ad Litem for John Doe.