**In re STEPHANIE B.**

**In re AMANDA A.**

**In re THOMAS J.**

Nos. 2002–490–M.P., 2002–491–M.P., 2002–492–M.P.

Supreme Court of Rhode Island.

June 30, 2003.

Charles Blackman, Esq., Thomas Corrigan, Esq., and Joseph Victor Smith, Esq., Providence, for Plaintiff.

Joyce Ioanes, Esq., Richard J. Welch, Esq., Martha Diamond, Esq., and Jonathan Fitta, Esq., Jamestown, for Defendant.

Present: WILLIAMS, C.J., and FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

These companion cases came before the Supreme Court on May 7, 2003, pursuant to three petitions for writ of certiorari by the petitioner, Butler Hospital (Butler or petitioner), a private mental health care facility, seeking review of several orders issued by the Family Court that enjoined Butler from discharging two minor children in the temporary custody of the respondent, the Department of Children, Youth and Families (DCYF) and, with respect to the third child in DCYF custody, an order that directed petitioner to appear and show cause why it refused to admit that child into the hospital. The petitioner argues that the Family Court exceeded its statutorily prescribed jurisdiction by issuing injunctions against Butler, a non-party to these cases, and did so without proper notice or an opportunity to be heard, in violation of Butler's due process rights. This Court issued the writ and consolidated the cases for briefing and argument based on the parallel issues presented.

Over a two-week span during the summer of 2002, in separate proceedings, the Family Court issued three injunctions against Butler in the absence of personal jurisdiction and without affording petitioner notice and an opportunity to appear and defend. The subjects of these injunctions were three juveniles in temporary custody of DCYF, Stephanie B., Amanda A., and Thomas J. (hereinafter Stephanie, Amanda and Thomas, respectively). Although the procedural history of each case varies to a degree, all three youths needed continued mental health care, and in each case, Butler became the designated treatment facility by order of the Family Court. Butler was not a party to any contractual relationship with DCYF or any other state agency, nor was Butler a party to these proceedings. Before addressing the merits of the appeal, the circumstances surrounding the care and treatment of each juvenile warrant a brief overview.

### Facts and Travel

Stephanie was civilly certified,[1] pursuant to the state's Mental Health Law, G.L.1956 § 40.1–5–8(a), to Bradley Hospital (Bradley), a private juvenile psychiatric facility, and had been in residential treatment at Bradley for four months when, after she attained the age of eighteen, Bradley sought to transfer her to adult placement

---

1. Pursuant to G.L.1956 chapter 5 of title 40.1, referred to as the "Mental Health Law," a child suffering from a mental illness or disorder under the age of 18 may be civilly committed by the Family Court for a six-month period, pursuant to § 40.1–5–8, and recertified prior to, or discharged at, the expiration of that period. Further, a minor may be civilly committed on an emergency basis for ten days. Section 40.1–5–7. Other than civil court or emergency certification, the only other means of admission recognized by the Mental Health Law is on a voluntary basis pursuant to § 40.1–5–6. The mental health statute provides safeguards for patients' rights, including a recent medical examination, a means of initiating discharge, and a hearing, when applicable.

at Butler, a facility that admits both adult patients and a limited number of minors. On July 24, 2002, a status hearing was held to review Stephanie's treatment plan, and a justice of the Family Court ordered Bradley to "contact Butler Hospital to apprise it of Bradley Hospital's plan to transfer * * * [Stephanie] to adult placement under the [M]ental [H]ealth [L]aw, and of its desire to transfer * * * [Stephanie] to Butler Hospital[.]" Furthermore, the order required that, if no agreement was reached concerning Stephanie's transfer, "Butler Hospital and/or its agents will be subpoenaed for the July 31, 2002 hearing and Butler Hospital will be expected to show cause why they are unable to assist Bradley Hospital with its plan." The petitioner was notified of the hearing justice's order after it was issued. On July 30, 2002, Butler sought to vacate the order on the ground that it placed an affirmative obligation on a disinterested, non-party without service of process or an opportunity to be heard and contravened the Family Court's jurisdictional authority. At a chambers conference on August 7, 2002, at which Butler was present, Stephanie's treating physician informed the court that Butler would not be suitable as a long-term placement for Stephanie. The Family Court justice thereupon excused Butler from further participation in the proceeding. Although effectively moot, the show cause order was not vacated, however, Stephanie was not admitted to Butler.

Amanda was placed in DCYF's temporary custody pursuant to a wayward petition and was hospitalized at Butler when, on August 7, 2002, a justice of the Family Court entered an order declaring that "[r]esp[ondent] at Butler—not to be disch[arged] w/o court order until DAS [Diagnostic Assessment Service evaluation on August 16th]." This "order," although lacking in formality and merely handwritten on the back of a wayward/delinquent event hearing sheet and signed by the hearing justice, was considered by Butler to be a binding order when it was received the next day. Butler complied with the order until Amanda was discharged into DCYF custody later that month.

The circumstances under which Thomas was the subject of a mandatory injunction are more troublesome. Under DCYF's custody by way of a wayward petition, Thomas was admitted to Butler as an inpatient after a criminal incident. On August 9, 2002, a status conference, off the record, was held with DCYF and other representatives on Thomas's behalf and an order was issued mandating that Thomas "remain on an inpatient basis at Butler Hospital pending further [o]rder of this [c]ourt." As was the case for the orders relative to Stephanie and Amanda, Butler was not a party to the proceeding, which culminated in this non-discharge order. Butler contends, and the sparse record establishes, that no medical doctor was consulted before the court mandated continued hospitalization of Thomas "pending further [o]rder of this [c]ourt." Clearly concerned for the well-being of an emotionally unstable child were he discharged without an alternative residential facility, the Family Court, pursuant to seven additional orders over the course of the next several months, continued its original injunction until October 28, 2002, when Thomas was discharged. Although DCYF was ordered to coordinate with the proper treating representatives at Butler "in an effort to locate and provide an appropriate placement" for Thomas, who no longer needed inpatient care, he remained hospitalized in a mental health facility until a bed at a residential center became available.

Although compliant with the non-discharge order, Butler was not idle. On September 6, 2002, Butler filed an emergency motion to vacate, or alternatively to

stay the order(s), accompanied by a memorandum and two medical affidavits stating that Thomas was medically stable, ready to be discharged, and likely to be harmed if hospitalized for a prolonged period. In response, on September 10, 2002, again at a chambers conference, the court informed DCYF that it would permit Butler to discharge Thomas on September 12, 2002. However, this order was subsequently revoked when Thomas's condition rapidly deteriorated after he was notified that he would be discharged to a homeless shelter. Once it became apparent that Thomas had relapsed when informed about his impending move to a homeless shelter and needed continued care and treatment, Butler agreed that Thomas's hospitalization should continue. However, when Thomas again reached the point of discharge and no longer needed inpatient care, Butler was enjoined from discharging him because DCYF had no alternative residential placement.

## Mootness

■ Before this Court, the petitioner acknowledges that the three companion cases are moot, but urges this Court to decide this case on the ground that circumstances giving rise to these petitions are capable of repetition and are likely to evade review. *In re George G.,* 676 A.2d 764, 765 (R.I.1996) (per curiam). We agree. This Court previously has concluded that " 'our whole idea of judicial power' is entailed within the concept of courts applying laws to cases and controversies within their jurisdiction." *Sullivan v. Chafee,* 703 A.2d 748, 752 (R.I.1997) (quoting *G. & D. Taylor & Co. v. Place,* 4 R.I. 324, 337 (1856)). Although judicial consideration of moot, abstract, academic, or hypothetical questions generally is beyond a court's judicial power, this rule is not absolute. *Morris v. D'Amario,* 416 A.2d 137, 139 (R.I.1980). An exception lies when the issue or question presented, while technically moot or deficient in some other respect, involves issues "of extreme public importance, which are capable of repetition but which evade review." *Id.* In this case, it is clear that juveniles in DCYF custody will continue to need mental health care and hospitalization in the future, and that resources and beds at treatment facilities and residential placements will continue to be sparse. Clearly, as in the case of Stephanie, Amanda and Thomas, if petitioner is again enjoined from discharging a juvenile patient from its facility, it is virtually certain that the child will be released before this Court has an opportunity to review the case. Butler has informed this Court that, although no *ex parte* restraining orders have been issued since Thomas's hospitalization, similar situations have presented themselves in the past and are likely to occur again. We accept this representation. A justiciable controversy is well illustrated by the circumstances presented herein and an exception to the mootness doctrine on the ground that this controversy is capable of repetition while evading review is warranted. Additionally, because the issues before us pertain to important questions of jurisdictional constraint and constitutional due process, they deserve our attention and will be addressed in this opinion.

## Issues

Butler argues that the orders issued by the Family Court exceeded the court's statutorily based jurisdiction and, even if the court was vested with jurisdiction, it had no authority to issue injunctions to a non-party over whom it had no personal jurisdiction. Butler contends that its due process rights, as protected by the Fourteenth Amendment to the United States Constitution and article 1, section 2, of the Rhode Island Constitution, were violated

when it became subject to orders enjoining discharge, in the case of Amanda and Thomas, and commanding that Butler appear and show cause why, in the case of Stephanie, it declined to admit her to the hospital. Butler argues that the Family Court's purported exercise of authority over it was a nullity. Additionally, Butler emphasizes that the orders were procedurally deficient, made in the absence of an adequate record, without appropriate factual findings and were unsupported by medical evidence or opinion. Furthermore, Butler argues that the orders effectively compelled a private entity to bear the burden and potential open-ended expense of accommodating and caring for these minor patients to perform a public duty relegated to DCYF, the state agency designated to provide care for the state's juvenile population. Although the orders were likely intended to address the chronic shortage of adequate juvenile residential "step-down alternatives" to psychiatric hospitalization, and the court obviously sought to minimize the upheaval facing three vulnerable juveniles in state custody, Butler contends that the court lacked authority to judicially conscript a private institution to carry out the state's responsibilities.

DCYF has responded to this petition and, although for divergent reasons, acknowledges the constitutional and procedural deficiencies of the Family Court orders. DCYF classifies the subject matter of these companion cases as controlled by chapter 5 of title 40.1, the Mental Health Law, and highlights how the Family Court failed to conform to the admission and discharge procedures dictated by statute. DCYF valiantly attempts to convince this Court that these petitions arose from a misapplication of the mental health act, but acknowledged at oral argument that, at least with respect to Amanda and Thomas, the state had no residential alternative for

these children, and that their continued hospitalization in a mental health care facility, although medically unnecessary, was its only viable option. DCYF admitted that the plight of these children was dictated by the state's lack of suitable residential placements and that a ban on out-of-state placements for troubled youth was in effect at the time of these orders, which exacerbated this problem. Finally, DCYF acknowledged that continuing Thomas at Butler was a better alternative than night to night placement or residence in a homeless shelter. Understandably, DCYF is focused on the need for protection of the juvenile and not the rights of petitioner from whom it sought to conscript a safe harbor.

The respondent notes that the Family Court order "skirt[ed] the timelines and procedural due process protections of the Mental Health [Law]." Specifically, DCYF argues that, pursuant to §§ 40.1–5–5 through 40.1–5–8 and § 40.1–5–11 of the Mental Health Law, the court's authority to order a juvenile hospitalized in a mental health facility is limited; a juvenile may be committed to an institution only upon a petition for civil court certification, recertification, emergency certification, or by voluntary admission. Accordingly, discharge is authorized only when carefully prescripted conditions are met and procedures followed. *See* § 40.1–5–11. DCYF contends that the court has no authority to order placement of a juvenile when he or she is hospitalized on a wayward petition or to *sua sponte* issue an order for emergency certification. Furthermore, DCYF admits that although the court may approve the placement of a juvenile in a specific facility, it may not unequivocally order such placement, especially when the facility does not consider itself suitable to address the individualized needs of the child. Although Butler agrees with DCYF

that the court exceeded its statutory authority, it disputes DCYF's suggestion that the court could have ordered the juveniles to be admitted to Butler had it followed different procedures. Based upon our review of the record, we conclude that DCYF has missed the point and is arguing in favor of circumstances that are irrelevant to the issues now before the Court.

### Attempted Intervention

We note that the Family Court sought to intervene in this case to support its contention that its orders were lawful and warranted. The Family Court argued that the writ should be quashed because of an inadequate record and because the Family Court was entitled to great deference under the circumstances.[2] We deem these arguments by an inferior tribunal to be without merit. The Family Court is neither a party in interest to these petitions nor does it have standing to voice its concerns over the jurisdictional implications presented herein, and we decline to address its contentions. Although we reject the suggestion that the writ should be quashed, we agree with the Family Court's

observation that the record of its proceedings is indeed lacking. Two of these orders were issued off the record, and all were issued without proper hearings, expert opinion or fact-finding.[3]

The exiguous record supports Butler's contention that, in the case of Stephanie and Thomas, which both came before the same Family Court justice, the proceedings that resulted in issuance of mandatory injunctions were conducted in chambers conferences. The result of this procedure, including the absence of evidence and fact-finding represents a failure by the Family Court to comply with its jurisprudential obligations in adversarial proceedings. Although we recognize that the volume of cases that come before this tribunal may dictate frequent chambers conferences, such *in camera* proceedings may not serve to supplant the adversarial process. This practice must stop.

Furthermore, Butler has informed the Court that in response to the initial order issued in Thomas's case, Butler brought several doctors to the Family Court who were prepared to testify, in open court, and provide expert opinion testimony that

---

**2.** The Family Court filed with this Court a motion to intervene and sought a stay of the proceedings. Counsel for the Family Court argued that the court is "indispensable to a full and fair hearing challenging its jurisdiction and the procedural approach employed by the petitioners circumvented the Family Court and denied it notice." By order of April 16, 2003, the Supreme Court denied the motion to intervene on the basis that the court lacked standing, *see Hassell v. Zoning Board of Review of East Providence*, 108 R.I. 349, 275 A.2d 646 (1971) (quasi-judicial bodies may not participate in appeals of their decisions for reasons of lack of standing), was not injured by a challenge to its jurisdiction, and was not a party entitled to notice or an opportunity to be heard. Further, this Court opined that intervention by the Family Court effectively might be construed as advocating against the petitioner, a wholly impermissible function for a judicial entity to undertake.

**3.** After this Court denied its motion to intervene and stay the proceeding, the Family Court sought permission to participate in oral argument on behalf of the Court Appointed Special Advocate (CASA). Counsel for the Family Court first wrote to the acting Supreme Court Clerk and, by letter dated April 25, 2003, represented that the Family Court's original motion to intervene was not really a motion by the court but was in actuality an effort by CASA to participate on behalf of the juveniles. Since the jurisdiction of the Supreme Court is not invoked by letter to the clerk, an "Ex parte Motion to Argue" was filed by counsel for the Family Court. This motion was denied by the Court en banc. We note, however, that CASA's participation on behalf of Amanda and Thomas was limited and the issues now before us are unrelated to their care and treatment.

Thomas's continued ·hospitalization was not medically necessary. After waiting outside the courtroom, the witnesses were informed that the Court had no time for a hearing that day; after a bench conference, the case was continued yet again. The orders that confined Thomas to Butler remained in effect without the benefit of any medical testimony relative to Thomas's best interests or the interests of Butler, despite Butler's efforts to the contrary. This procedure, including allowing busy professionals to languish in the corridor only to be informed that the court had no time to hear from them, in no way furthers the goal of increasing public confidence in our courts.

### Limited Statutory Authority of the Family Court

As an initial matter, we shall address the authority of the Family Court over the care and placement of juveniles who need mental health care and treatment. Generally, the Family Court is vested with broad powers over matters affecting children. *O'Connell v. O'Connell,* 100 R.I. 444, 446–47, 216 A.2d 884, 886 (1966). Pursuant to G.L.1956 § 8–10–3, the Family Court is authorized to hear and determine cases pertaining to wayward or dependant children who need custodial care or treatment.[4] Furthermore, chapter 5 of title 40.1, which DCYF relied on to

support its argument, clearly contemplates the guidance and authority of the Family Court in matters of certification of minors who need custodial care in a mental health facility.[5]

It is well settled that "[t]he Family Court, as a court of statutory origin, has no more powers than those expressly conferred upon it by the Legislature." *Rubano v. DiCenzo,* 759 A.2d 959, 963 (R.I.2000) (quoting *Waldeck v. Piner,* 488 A.2d 1218, 1220 (R.I.1985)). With respect to the orders now before the Court, it is apparent that the justices of the Family Court were not acting under the power conferred upon it by § 8–10–3, the state mental health statutes, or pursuant to some other statutory authority. Notwithstanding the argument of DCYF, no efforts were made to certify or recertify any of the juveniles facing discharge from Butler; no meaningful hearings were conducted, and no medical testimony was elicited relative to their need for continued confinement in a mental health facility. Arguably, the Family Court had subject matter jurisdiction over Stephanie, because of her prior civil certification, and over Amanda and Thomas, pursuant to wayward petitions. However, the relevant inquiry is whether the Family Court had the authority to compel a nonparty, private treatment facility to admit and retain these juveniles within its facili-

---

4. General Laws 1956 § 8–10–3, known as the Family Court Act, provides in pertinent part:

 "**Establishment of cou rt—Jurisdiction— Seal—Oaths—Masters.** (a) There is hereby established a family court, consisting of a chief judge and eleven (11) associate justices, to hear and determine * * * those matters relating to delinquent, wayward, dependent, neglected, or children with disabilities who by reason of any disability requires special education or treatment and other related services; to hear and determine all petitions for guardianship of any child who has been placed in the care,

custody, and control of the department for children, youth, and families * * *."

5. In the case of a civil court certification, for example, § 40.1–5–8, entitled "**Civil court certification[,]**" provides that:

 "A verified petition may be filed in * * * [F]amily [C]ourt in the case of a person who has not reached his or her eighteenth (18th) birthday for the certification of any person who is alleged to be in need of care and treatment in a facility, and whose continued unsupervised presence in the community would create a likelihood of serious harm by reason of mental disability."

ty. Because the court's orders deviated from the certification procedures for patient admission as required by the Mental Health Law, and because no other statutory authority exists, the Family Court exceeded its jurisdiction. Furthermore, these orders are equitable in nature and the Family Court has no general equitable power. *See Waldeck v. Piner,* 488 A.2d 1218, 1220 (R.I.1985) (citing *Britt v. Britt,* 119 R.I. 791, 794–95, 383 A.2d 592, 594 (1978)). At no time was the Family Court vested with equitable authority to enjoin a non-party over whom it had no personal jurisdiction or to issue orders that it had no power to enforce.

In sum, with respect to a child who has been medically certified as needing care and treatment in a mental health care facility, the Family Court may assert jurisdiction over that child and may civilly commit him or her in accordance with statutory prerequisites. However, no authority lies to order a private hospital to accept the patient or to warehouse a child for whom no appropriate residential placement is available. The Family Court is not a court of general equitable jurisdiction and has limited equitable power. In addition to the absence of the Family Court's authority to act in this instance, the obvious due process violations, to be addressed below, are equally dispositive of the outcome in these petitions.

### Constitutional Limitations

 The basic concept of due process of law is found in the Fourteenth Amendment to the United States Constitution and article 1, section 2, of the Rhode Island Constitution, both of which prohibit a state from depriving any person "of life, liberty, or property, without due process of law." [6] "A claimant alleging a deprivation of due process rights must demonstrate that either a property or liberty interest clearly protected by the due process clause was divested * * * without [adequate] procedural safeguards." *Bradford Associates v. Rhode Island Division of Purchases,* 772 A.2d 485, 490 (R.I.2001) (quoting *Salisbury v. Stone,* 518 A.2d 1355, 1360 (R.I.1986)) (citing *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548, 556 (1972)). A fundamental principle of procedural due process is that a court may not issue a judgment or order against a person in the absence of personal jurisdiction. When a party is appropriately before the Court, having been properly served with process, and has entered an appearance or appeared specially to contest jurisdiction, the court is vested with jurisdiction, either personal jurisdiction over the party or limited authority to decide the jurisdictional challenge. *See Theta Properties v. Ronci Realty Co.,* 814 A.2d 907, 912–13 (R.I.2003) (dissolved corporation's motion to dismiss, equivalent to a special appearance, based upon its incapacity to be served legal process should have been granted because the court lacked jurisdiction to entertain suit or enter judgment against it); *see also* Rules 4 and 8 of the Superior Court Rules of Civil Procedure and the Family Court Rules of Procedure for Domestic Relations. The validity of a judgment or order depends on whether the interested party has received notice and has been afforded

---

**6.** As amended in 1986, article 1, section 2, of the Rhode Island Constitution renders this state's due process clause applicable to civil actions. *Kelly v. Marcantonio,* 678 A.2d 873, 882 (R.I.1996). Prior to this amendment, the state's constitution only included a criminal due process provision, article 1, section 10, and appeals before this Court concerning due process rights in civil cases were restricted to the Fourteenth Amendment. *See Berger v. State Board of Hairdressing,* 118 R.I. 55, 57–58, 371 A.2d 1053, 1054–55 (1977); *Twomey v. Carlton House of Providence, Inc.,* 113 R.I. 264, 270–71, 320 A.2d 98, 101–02 (1974).

an opportunity to defend against its entry. *Nisenzon v. Sadowski*, 689 A.2d 1037, 1048–49 (R.I.1997) (judgment against unnamed partners in business partnership was declared void and violative of their due process rights because the absent partners never were afforded notice and opportunity to be heard); *State v. Manco*, 425 A.2d 519, 521, 522–23 (R.I.1981) (order enjoining husband from encumbering or disposing of his interest in property violated his due process rights where order was entered during support proceedings in which he appeared as complaining witness; he was never notified that his property interests would be adjudicated and was given no opportunity to present a case or raise objections). Notice apprises interested parties of the pendency of the action and affords them an opportunity to present their objections at a meaningful hearing. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *see also Mills v. Howard*, 109 R.I. 25, 27, 280 A.2d 101, 103 (1971) (execution issued against father allegedly delinquent in child and spousal support payments without affording him notice amounted to a denial of due process). Notwithstanding the existence of a compelling issue requiring quick resolution, personal jurisdiction is an unwavering requirement of our jurisprudence.

Moreover, even emergent situations require some level of due process protection. A temporary restraining order that is issued without notice to the adverse party to prevent "immediate and irreparable injury, loss, or damage" is a temporary stopgap measure to preserve the status quo and expires by its terms. A hearing for a preliminary injunction must be scheduled forthwith during which the party against whom the temporary order was issued may appear and defend. A preliminary injunction may not be issued without notice to the adverse party. Rule 65 of the Superior Court Rules of Civil Procedure and the Family Court Rules of Procedure for Domestic Relations.

We now turn to the situation before us on certiorari. In so doing, we are mindful that this Court's review "is restricted to an examination of the record to determine whether any competent evidence supports the decision and whether the decision maker made any errors of law in that ruling[,]" or whether the decision was "patently 'arbitrary, discriminatory, or unfair.'" *Asadoorian v. Warwick School Committee*, 691 A.2d 573, 577 (R.I.1997) (citing and quoting *D'Ambra v. North Providence School Committee*, 601 A.2d 1370, 1374, 1375 (R.I.1992)).

The record establishes that Butler was not a party to the treatment review hearings of Stephanie, Amanda, or Thomas. Service of process did not issue in these cases, and Butler was deprived of notice and an opportunity to be heard in proceedings that culminated in mandatory injunctions that implicated its property interests. For these reasons, we are convinced that personal jurisdiction was not established and the Family Court had no authority to order Butler to negotiate treatment plans with Bradley, or refrain from discharging two juvenile patients. These orders were issued without regard to and in contravention of the treating physicians' medical recommendations, and without concern for how Butler was to be reimbursed. *See In re Doe*, 120 R.I. 885, 390 A.2d 390 (1978) (Family Court lacked authority to compel Director of Mental Health, Retardation and Hospitals to pay for private treatment at court-selected facility). As noted, *ex parte* injunctions are prohibited in this state. Significantly, the authority of the Family Court to issue injunctive relief is limited in scope and the court had no authority to issue the orders now under review. *See* § 8–10–3.

Thomas's hospitalization is of particular concern because of the length of time in which Butler was restrained from discharging him. This Court previously has recognized that in civilly certifying a person for mental health treatment the court must, after a meaningful hearing, provide care in the least restrictive environment that is appropriate to the condition of the patient. *Rhode Island Department of Mental Health, Retardation and Hospitals v. R.B.*, 549 A.2d 1028, 1030 (R.I.1988). Included in the penumbra of protections afforded vulnerable persons subject to civil commitment are the statutory responsibilities of the health care provider to the patient. In the context of outpatient treatment, we have opined that a private facility ought not be ordered to accept a patient unless willing to do so. *Id.* at 1031. By implication, a private inpatient facility should be afforded the same protection. Upon order of the Family Court, Butler, as a non-party, was without recourse and was obligated to obey the orders until they were "stayed, modified, or set aside on review," whether valid or not. *See In re Doe*, 120 R.I. at 895, 390 A.2d at 396. In its zeal to provide adequate, safe supervision of Stephanie, Amanda and Thomas, and clearly sensitive to their needs, the Family Court acted without regard for Butler's due process rights. Moreover, the court's disregard of the statutory mandates of the Mental Health Law, and its own rules of procedure for injunctions, compromises not only Butler's rights, but also those of the patients who need the utmost protection. Thomas's lengthy institutionalization, unsupported by medical opinion, directly contravened the state's civil commitment statutes. No adequate evidence was presented to the hearing justices before these mandatory injunctions were issued. Based upon the absence of personal jurisdiction, and the lack of fairness inherent in the unorthodox procedures that the Family Court employed, the orders issued by that court are unsupportable and must be set aside.

## Conclusion

In conclusion, in an apparent effort to ameliorate the unfortunate circumstances facing three DCYF juveniles who needed suitable residential supervision and mental health treatment, the Family Court exceeded its statutory and constitutional boundaries. In so doing, the petitioner's right to due process was violated. Although the protections afforded mental health patients are provided by the federal and state Constitutions and the Mental Health Laws, *see Parham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), the rights of private medical facilities that are devoted to patient recovery are owed the same level of constitutional protection. Absent a civil certification procedure for a mentally ill child, the Family Court is without authority to order a child's confinement in a mental health care facility and has no authority to order placement in a specific facility that is unwilling to accept the patient. That said, we discern no alternative but to quash the orders of the Family Court in these three related cases. Although moot as to Stephanie, Amanda and Thomas, our holding has implications for parallel instances in the future.

Finally, it has not escaped our attention that the need for appropriate residential placements for children in DCYF custody who no longer require acute mental health treatment should be addressed; however, the ultimate solution lies not with the judiciary, but with the other two branches of state government.

For the foregoing reasons, the petition for certiorari is granted and the orders of the Family Court are quashed. The papers in this case are remanded to the

Family Court with our decision endorsed thereon.

Justice FLAHERTY did not participate.