Cynthia L. GUERTIN

v.

Arthur R. GUERTIN.

No. 2003–377–Appeal.

Supreme Court of Rhode Island.

March 14, 2005.

Brenda F. Rioles, Providence, for Plaintiff.

Thomas Dickinson, Providence, for Defendant.

Present: WILLIAMS, C.J., FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

PER CURIAM.

In this highly contentious custody proceeding, a divorced father appeals from a Family Court order denying his post final-judgment motion to modify custody and/or placement, contending that the trial justice improperly considered the results of a polygraph examination of the child's mother. In deciding this appeal, however, we need not revisit the question of the admissibility of polygraph test results. The polygraph examination itself was neither offered nor admitted into evidence; rather, the mother's responses to four pertinent test questions and the examiner's conclusion were referred to in a psychological evaluation that was proffered into evidence by the father himself without any request that such references be redacted.

The father argues, however, that the trial justice erroneously considered the results of the polygraph examination, which results, he asserts, were not independently admitted into evidence. Thus, he further contends, the trial justice never fulfilled her "gatekeeping" function to probe the reliability of such scientific or technical evidence. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *DiPetrillo v. Dow Chemical Co.,* 729 A.2d 677 (R.I.1999). He also assigns error to an order entered by the trial justice restraining his current wife from being involved in the child's pharmacological needs.

This case came before the Supreme Court pursuant to an order that the parties show cause why the issues raised should not summarily be decided. Upon hearing the arguments of counsel and examining the memoranda filed by the parties and the record of the proceedings below, we conclude that cause has not been shown, and that the case should be decided at this time. We affirm the Family Court order denying the motion to modify, but vacate the restraining order.

### Facts and Travel

The marriage between Cynthia L. Guertin (plaintiff) and Arthur R. Guertin (defendant) was legally dissolved on June 30, 2000. Unfortunately, the entry of a final judgment failed to abate the hostile nature of their relationship. By the terms of the final judgment, the parties were awarded joint custody of their two-year-old daughter, with physical placement granted to plaintiff. After they were divorced, however, the parties continued to engage in a pattern of accusations and counteraccusations repeatedly denigrating each other's parenting abilities.

These recriminations resulted in criminal charges that plaintiff lodged against defendant, a complaint for protection from abuse that plaintiff filed but subsequently withdrew, several complaints that defendant filed with the Department of Children, Youth and Families (DCYF) against plaintiff and the child's home daycare provider, and numerous motions and cross-motions filed in Family Court. The trial justice remarked that the parties have become "attuned to using the [c]ourt system as a third parent," and that "[e]ffectively, this Family Court is the triage team of Mr. and Mrs. Guertin, as opposed to medical professionals." She also observed that in a previous hearing the General Magistrate

had indicated that the parties demonstrated such a complete inability to communicate with each other on custodial decisions that he would not order them to do so; a situation that the trial justice characterized as "[q]uite extraordinary." In the present case, the trial justice specifically found that each party "has a clear misunderstanding of the rights and responsibilities of a joint custodial parent." We concur with her assessment.

The matter now before us arises out of the child's visit with defendant and his new wife in August 2001. According to plaintiff, the child made disclosures suggesting that she had been inappropriately and sexually touched by both her father and stepmother. After an investigation by the South Kingstown Police Department and DCYF, the allegation of sexual abuse was deemed unfounded. In an apparent response to these allegations, on September 4, 2001, defendant filed a motion to modify placement, requesting that the child be placed with him and that plaintiff pay child support.[1] The defendant alleged that plaintiff repeatedly had made "unfounded and untrue statements so as to cause expense and stress" to defendant and to damage his relationship with his daughter. On November 9, 2001, the Family Court ordered both parties to participate and cooperate in an evaluation by Dr. John Parsons.

In late 2001, Dr. Parsons conducted psychological evaluations of both parents. In conducting the psychological evaluation of plaintiff, Dr. Parsons reviewed the results of a polygraph examination that plaintiff had undertaken at her attorney's suggestion in an effort to disprove the allegation that she had "coached" her daughter to falsely accuse defendant. Doctor Parsons' written evaluation quotes a section of the polygraph report in which the polygraph examiner opined that plaintiff had neither planted false information in her daughter's mind nor encouraged her daughter to fabricate the allegations against defendant.[2]

On January 28, 2002, plaintiff filed a motion to modify visitation. Under the visitation order in place at the time, defendant had visitation with his daughter every

---

**1.** It does not appear from the record that defendant ever filed a motion to modify the order of joint custody. The motion he filed on September 4, 2001, is entitled "Motion to Modify Placement." However, in her Sup. Ct.R. 12A statement, plaintiff states that defendant filed a motion for sole custody on August 29, 2001, and defendant, in his Rule 12A statement, indicates that he sought "custody or placement" of the child. Indeed, at the commencement of the evidentiary hearings, he represented to the court that "pending * * * is [his] motion for custody and placement." Also in her decision the trial justice denied "Mr. Guertin's motion for sole custody" and "[h]is motion for placement." We will treat defendant's motion, therefore, as a motion to modify both the order of joint custody and the order of physical placement.

**2.** Doctor Parsons' report, dated January 12, 2002, contains a reference to a polygraph test that was provided to him by plaintiff's attorney, indicating that plaintiff truthfully answered "no" to the following questions:

"Did you at any time this past month of August or September verbally or physically coach your daughter * * * what to say about any sexual contact with her father, Arthur, and his wife, Maryanne?

"Did you at any time this past month of August or September plant any lies in the mind of your daughter * * * about sexual contact performed by her father, Arthur, or his wife, Maryanne[?]

"Did you at any time during the past August or September either physically or verbally plant any false information in [your daughter's] mind about any sexual contact by her father, Arthur, or wife, Maryanne[?]

"Right now, could you give me the name of one other person that physically or verbally planted false information in the mind of [your daughter] about sexual contact by her father, Arthur, or Maryanne, this past August or September 2001?"

weekend. The plaintiff moved to modify this schedule so that the child would spend every other weekend with her. The plaintiff also sought to enjoin defendant's wife from "interfering with any issues or decisions involving the minor child's * * * medical needs."

On April 3, 2002, the Family Court commenced hearings on the cross-motions. Over the course of seven hearing dates, the trial justice heard testimony from: both parties; Maryanne Sticca–Guertin, defendant's wife; Dr. Parsons; David Girard, a registered pharmacist, and several other witnesses.

During defendant's direct examination, his attorney introduced the two psychological reports that Dr. Parsons prepared. The plaintiff objected to their introduction—arguing that the documents contained "many items of hearsay and other non-foundational evidence" to which Dr. Parsons had not testified. The trial justice allowed the reports into evidence, had them marked as full exhibits, and noted that this was a nonjury trial and that she "should be capable of differentiating between what [she] should and shouldn't be understanding." During cross-examination of Dr. Parsons, plaintiff questioned him about some of the data on which he had relied in preparing his reports. The defendant objected—arguing that plaintiff was attempting to refer to records not in evidence. The trial justice overruled the objection, concluding that plaintiff was not introducing the data, but rather was simply using it as a "cross-examining tool."[3]

During the hearings, several witnesses testified about an incident involving the child's prescription medication. In July 2001, during a weekend visit with defendant and his wife, the child suffered an injury or allergic reaction to her eye. The defendant brought the child to a treatment center, where the physician on duty diagnosed a reaction to a bug bite for which he prescribed medication. Mrs. Sticca–Guertin, a registered pharmacist, then went to a local pharmacy to obtain the medication. According to the manager of the pharmacy, David Girard, Mrs. Sticca–Guertin was given permission to telephone the physician and consult a reference book to ascertain the correct dosage for a young child. Mr. Girard further testified that Mrs. Sticca–Guertin took the prescription over the telephone and entered the information in the pharmacy's computer system. Mr. Girard, however, retrieved the medicinal syrup from the shelf and poured it into the bottle himself, rounding the amount up by six milliliters of medication. Mr. Girard indicated that it was standard procedure to dispense extra medication to compensate for the foreseeable spillage that occurs when giving medication to a young child. According to Mr. Girard, Mrs. Sticca–Guertin "ran the prescription through, labeled the bottle, checked it," and then a technician processed the prescription. Conversely, in her testimony, Mrs. Sticca–Guertin stated that she had "filled" the child's prescription.

After the child was returned to plaintiff, she brought the child to a hospital emergency room to be evaluated for signs of child abuse. The next weekend, upon picking up the child for his weekend visitation, defendant noticed that the prescription bottle still contained some medication. The defendant thereupon challenged plain-

---

**3.** At another point in the trial, defendant attempted to question Dr. Parsons about whether "any of [his] findings or clinical impressions regarding Ms. Guertin have any impact on whether she would successfully complete a lie detector test." The plaintiff objected to this question and the Family Court justice sustained that objection. At no other time during the trial were the polygraph test or results mentioned.

tiff's fitness to administer medicine to the child, averring that if the mother had given the correct dosage of medication the bottle would have been empty. The plaintiff responded by filing a complaint with the Rhode Island Board of Pharmacy against Mrs. Sticca–Guertin.

After the close of testimony, the trial justice delivered a bench decision on August 6, 2002. Finding that plaintiff had not "prompted, coached, or tried to alienate her daughter from [Mr. Guertin]" and that the child had made disclosures suggesting sexual abuse not only to plaintiff, but also to a social worker and at her preschool, the trial justice denied Mr. Guertin's motion for sole custody. She also denied his motion for change of placement because there had not been any significant change of circumstances since the original awards of joint custody and physical placement, saying:

> "Their respective hostility to each other, their use of governmental agencies at the drop of a hat, their total inability to communicate as was found most recently by [the General Magistrate], but clearly existed prior to the time these people even came in for a divorce in 1998."

The Family Court justice also found that Mrs. Sticca–Guertin acted in a "most inappropriate manner by filling medication for the child" and therefore granted plaintiff's motion that "the stepmother/pharmacist in this case have nothing ever more to do with handling any prescriptions for this child."

Next, finding that "Mr. Guertin exhibits significant controlling behavior when it comes to his daughter's day-to-day life, and that that behavior has materially contributed to the inability of these parties to effectively communicate for the benefit of this child," the trial justice indicated that it was necessary to carefully delineate the visitation rights to be enjoyed by defen-

dant. She then proceeded to establish a visitation schedule in meticulous detail covering weekends, holidays, Father's Day, Mother's Day, the child's birthday, and summer vacations.

Because of the parties' "remarkable inability to communicate," the trial justice said that plaintiff, "as the primary caretaker," was to be responsible for "all day-to-day decisions" concerning the child, including choice of preschool and routine medical situations. Significant medical decisions were to be made jointly.

On October 17, 2002, an order was entered, republishing the award of joint custody of the child and physical placement with plaintiff. The order also enjoined and restrained Mrs. Sticca–Guertin "from being involved in any way with the child's pharmacological needs; however she is allowed to accompany Defendant[ ] father to any medical facility or appointment while the child is in his care."

On appeal, defendant asserts two errors by the trial justice. First, defendant avers that the Family Court justice impermissibly considered the results of the polygraph examination, "results that were not themselves admitted into evidence and were never subjected to any kind of scrutiny." To support his contention that the Family Court justice relied on such results, defendant emphasizes the following portion of her decision:

> "It is of note that Ms. Guertin did submit herself to a polygraph test that was administered by an accredited polygraph examiner. She submitted to the polygraph to determine whether or not she had, in any way, attempted to alienate her daughter from Mr. Guertin by prompting these dreadful allegations. The polygraph examiner indicated in his mind based on all the questions put to Mrs. Guertin in that regard she essentially passed her polygraph, and the ex-

aminer was satisfied that she has not prompted her daughter to make these allegations. It does not appear that, for whatever reason, Mr. Guertin has taken or submitted to a polygraph, and certainly there is no suggestion that he did or should submit to a plethysmograph. So if I can be satisfied and, I am, that the mother has not done anything intentionally to sabotage the relationship between the child and her father, it gives me some confidence that I can make a reasonable decision regarding who should have full custody or primary care of this child. The Court is well aware that the results of a polygraph test are not routinely accepted into evidence. However, since they were included as a recommendation by the Court sanctioned psychologist, Dr. John Parsons, the Court has some comfort in feeling it can consider the record as presented, as clearly Dr. Parsons would have."

Second, defendant avers that the Family Court justice erred in ordering Mrs. Sticca–Guertin to have no contact with the child's prescriptions.

### Standard of Review

■ A Family Court justice "should not modify a child's custody-placement decree unless there has been a showing by the moving party by a preponderance of evidence that 'the conditions or circumstances existing at the time the decree was entered have so changed that it should be modified in the interest of the child['s] welfare.'" *Kettelle v. Kettelle,* 707 A.2d 268, 269 (R.I.1998) (quoting *Suddes v. Spinelli,* 703 A.2d 605, 607 (R.I.1997)). "Until and unless the moving party meets this burden, the prior custody award should remain intact." *Suddes,* 703 A.2d at 607. We review the Family Court justice's "denial of a motion to modify a prior custody award to determine whether an abuse of discretion has occurred." *Id.* Further-

more, we will "not disturb findings of fact made by a Family Court justice unless the individual taking the appeal can show that such findings are clearly wrong or that the trial justice overlooked or misconceived evidence relevant to the issues decided." *D'Onofrio v. D'Onofrio,* 738 A.2d 1081, 1083 (R.I.1999) (citing *Lembo v. Lembo,* 677 A.2d 414, 417 (R.I.1996)).

### Motion to Modify Custody/Placement

■ Our review of the record supports the Family Court justice's decision that defendant failed to prove a sufficient change of circumstances from those that existed when the Family Court entered the divorce decree in 2000. Moreover, after reviewing the record and the bench decision, we conclude that the Family Court justice's decision is more than sufficiently predicated on evidence independent of the polygraph results. Not only did defendant fail to satisfy his burden with respect to demonstrating a significant change of circumstances, but also it is clear that he failed to convince the trial justice that a modification of the custody or placement order would be in the interest of the child's welfare.

As is evident from her decision, the trial justice was uncomfortable with any custody arrangement involving these parents, both of whom she found had a "clear misunderstanding of the rights and responsibilities of a joint custodial parent." She noted that the parties have been utterly unable to communicate with each other on behalf of the child, resorting to their attorneys and the court as their only means of parley. Perhaps the trial justice's findings are best summarized by her comment that "there were times during this testimony, frankly, where this Court became satisfied that neither one of these parties could stand the scrutiny of being measured against any, let alone all of the variables in

the *Pettinato* case; that seminal case that gives judges guidance in determining what is in the child's best interest."[4]

The trial justice then evaluated the allegations of possible sexual abuse within this context of enmity and extreme distrust. She found that the child had in fact made a disclosure to plaintiff suggesting that she had been inappropriately and sexually touched by both her father and stepmother. The trial justice specifically found that the child made a similar disclosure to a DCYF social worker, and was overheard at daycare telling other students that she told Mrs. Sticca–Guertin and defendant "not to touch her private parts."

The trial justice considered the disparate evidence. She noted that court personnel were instructed to observe visits between defendant and the child, and that the child "showed absolutely no fear or apprehension of being around the father and stepmother." Yet videotapes taken by plaintiff after the child returned from visits with her father depicted the child engaging in sexual behavior. Although DCYF ultimately deemed the allegations of abuse unfounded, the trial justice lamented the manner in which both parties had conducted themselves:

> "The bottom line, although there was an attempt made to suggest that this child never displayed any so-called 'red flag' behaviors, it is clear to this Court that the fact that she had made a disclosure to her mother and to the social worker and made those comments at preschool, had this child been properly evaluated when the suggestion was made that she be seen at the Child Safe Clinic, perhaps then we could have resolved with some sort of clarity whether or not there has ever been any kind of abuse against this baby. Now, however,

it is probably too late for anyone to get an accurate reading of what may or may not have happened to [this child]. It is clear, for example, based on statements in this record that the child spoke of walking in on her father and stepmother having sex. Clearly, that may well have had some impact on her sexual knowledge and the comments that she made to her mother, understanding based on the history of this case, that any kind of comments made to either one of them were immediate cause for government intervention."

Since "parental alienation" was the basis of defendant's motion for sole custody, the Family Court justice denied his motion. The Family Court justice also found that there was no significant change of circumstances justifying a change in placement. We are satisfied that she made a thorough review of the testimony and the evidence and did not misconceive or overlook anything in the record. The Family Court justice properly relied on ample evidence independent of the references to the polygraph examination to support her ultimate decision to deny defendant's motion to amend the custody award. For instance, the trial justice characterized defendant's behavior as hypervigilant, and found that he "exhibits significant controlling behavior when it comes to his daughter's day-to-day life, and that that behavior has materially contributed to the inability of these parents to effectively communicate for the benefit of this child." She also noted that he had made at least three complaints to DCYF, all of which had been determined to be unfounded.

Significantly, the trial justice found that "Mr. Guertin clearly demonstrated his need to control and his inability to foster a good relationship between the child and the child's mother * * *." The trial jus-

4. *Pettinato v. Pettinato,* 582 A.2d 909 (R.I. 1990).

tice expressed her incredulity when defendant testified that plaintiff had limited his visitation on Father's Day 2001, yet photographs clearly established that he had had the child for the entire day. Moreover, the trial justice was dismayed that defendant had denied plaintiff time with the child on Mother's Day 2002 in disregard of "what this Court clearly indicated would be an appropriate time frame for her to enjoy her daughter on Mother's Day."

Unfortunately, the parties' behavior, their inability to communicate, their hypervigilance, their mutual misunderstanding of the responsibilities of joint custodial parenthood were extant at the time of the original custody order. Mr. Guertin had failed to show a change of circumstances sufficient to warrant a modification of either custody or placement. Moreover, there was ample evidence suggesting that it might well not be in the child's best interest for him to be the sole custodial parent.

■■■ Although the trial justice's comments about the polygraph examination may have been imprudent, her reference to plaintiff's polygraph test results was harmless error in the circumstances of this case. We long have held that "because test results of polygraph examinations have not been established as scientifically accurate and reliable * * * it is improper for them to be introduced for any purpose." *State v. Villafane*, 760 A.2d 942, 944 (R.I.2000) (citing *State v. Dery*, 545 A.2d 1014, 1017–18 (R.I.1988)). We do not retreat from that position today. However, defendant's argument that the trial justice erred because she undertook "no analysis whatsoever of the reliability of [the polygraph] evidence" fails to persuade us that her decision must be reversed.

We first note that the results of the polygraph examination were contained within Dr. Parsons' report, which was proffered into evidence by defendant, over plaintiff's objection, without any attempt to redact the references to the polygraph examination. Later in the trial, defendant objected to plaintiff's use of psychological testing raw data on her cross-examination of Dr. Parsons. The defendant said he would have no objection to placing into evidence all the records that Dr. Parsons referred to in his evaluation, stating "the report speaks for itself." At no point did he attempt to draw the trial justice's attention to the fact that the report referred to a polygraph examination. Having placed the psychological evaluation referring to the polygraph results into evidence in this civil, nonjury matter, defendant has waived any claim of error regarding its admission into evidence.

Secondly, in light of our review of the trial justice's decision, we are satisfied that she did not impermissibly rely on the polygraph results in finding that plaintiff has not "prompted, coached or tried to alienate" the child from defendant. Rather, the trial justice considered the circumstances of the child's various disclosures and the conflicting evidence, and concluded that, regrettably, given the poisoned atmosphere created by both parents, it was probably too late to resolve with any certainty what may or may not have happened to the child. Simply put, defendant failed to satisfy his burden of proof to establish a significant change of circumstances or to show that plaintiff repeatedly had attempted to make unfounded and untrue statements to damage his relationship with the minor child.

We perceive the trial justice's reference to the results of plaintiff's polygraph examination as an attempt to secure some reassurance in her decision to maintain the custodial status quo in light of the hostilities between the parents. As the trial justice said, she was "well aware that the

results of a polygraph test are not routinely accepted into evidence." But, here, as they were included as a recommendation by Dr. Parsons, she believed she could "consider the record as presented." Although we disagree with her conclusion—polygraph results have not yet been established as reliable—her consideration of the results in this case was harmless error.

### Restraining Order

█ The second issue defendant presented on appeal is his contention that the trial justice erred by restraining and enjoining Mrs. Sticca–Guertin "from being involved in any way with the child's pharmacological needs." In essence, he argues that the trial justice misconceived the evidence by finding that the testimony of Mr. Girard, the pharmacist, contradicted that of Mrs. Sticca–Guertin, and that the latter therefore lacked credibility. He maintains that their testimony was not inconsistent; although Mrs. Sticca–Guertin testified that she "filled" the prescription, she never said that she actually poured the medication into the bottle.

██ In a trial without a jury, credibility determinations are within the sound discretion of the trial justice. *Bogosian v. Bederman,* 823 A.2d 1117, 1120 (R.I.2003). On appeal, we will not interfere with a trial justice's exercise of such discretion unless he or she has overlooked or misconceived material evidence, or is clearly wrong. *Id.*

In the case before us, our review of the evidence does not lead us to the conclusion that the trial justice overlooked or misconceived any material evidence, or that she was otherwise clearly wrong in her credibility determinations. Moreover, in the context of this bitterly contentious custody proceeding, we are satisfied that the evidence adequately supports the trial justice's finding that "it is not appropriate for Mrs. Sticca–Guertin to be involved in any way with the child's pharmacological needs." Nevertheless, we are constrained to vacate the restraining order.

██ From the record it is clear that Mrs. Sticca–Guertin was never a party to this action. The plaintiff's motion to enjoin Mrs. Sticca–Guertin from any involvement with the child's medical needs did not seek to add Mrs. Sticca–Guertin as a party, and the motion was never served on Mrs. Sticca–Guertin. It is a fundamental principle of procedural due process "that a court may not issue a judgment or order against a person in the absence of personal jurisdiction." *In re Stephanie B.,* 826 A.2d 985, 993 (R.I.2003). "When a party is appropriately before the Court, having been properly served with process, and has entered an appearance or appeared specially to contest jurisdiction, the court is vested with jurisdiction * * *." *Id.* Although it is true that Mrs. Sticca–Guertin was aware of the proceedings and, in fact, testified during the trial, her presence did not cure the due process deficiency, constitute an entry of appearance, or transform her into a party. "Pursuant to the rules relating to service of process, '[a] party to a judgment is one who is named as such in the record and is properly served with process or enters an appearance.'" *Nisenzon v. Sadowski,* 689 A.2d 1037, 1048 (R.I.1997) (quoting *State v. Manco,* 425 A.2d 519, 521 (R.I.1981)). "An appearance is '[a] coming into court *as party* to a suit, either in person or by attorney, whether as plaintiff or defendant.'"[5] *Id.* (quoting Black's Law Dictionary 97 (6th ed. 1990)).

---

5. "[T]he mere fact that a defendant has knowledge of a suit pending against him is insufficient to give a court jurisdiction, absent service of process or a voluntary appearance * * *." *Nisenzon v. Sadowski,* 689 A.2d 1037,

A "void judgment or decision is one in which the court entering the judgment lacked jurisdiction over the matter or when the court's action violated a procedural requirement so substantial that it amounted to 'a plain usurpation of power constituting a violation of due process.'" *DeLuca v. DeLuca*, 839 A.2d 1237, 1241 (R.I.2004) (quoting *Allstate Insurance Co. v. Lombardi*, 773 A.2d 864, 869 (R.I.2001)). This Court has found significant procedural defects amounting to a "clear usurpation of power" and a violation of due process when substantial defects in notice and service of process existed. *See Nisenzon*, 689 A.2d at 1048–49 (holding judgment was void as against individual partners in a business partnership because they were not named as parties to the suit, were not served with process, and did not waive service of the summons and complaint). Because Mrs. Sticca–Guertin was not named as a party, was not served with process, and did not waive service of the summons and complaint, she cannot be a party, and the Family Court had no jurisdiction over her. Consequently, the injunction entered against her is void.

"A void judgment is from its inception a legal nullity." *DeLuca*, 839 A.2d at 1241 (quoting *United States v. Boch Oldsmobile, Inc.*, 909 F.2d 657, 661 (1st Cir.1990)). Because it is clear that the injunction entered against Mrs. Sticca–Guertin was void, we have no choice but to wield our judicial shears and prune the order.[6] "The universal rule holds that: 'A judgment void upon its face and requiring only an inspection of the record to demonstrate its invalidity is a mere nullity, in

legal effect no judgment at all, conferring no right and affording no justification. Nothing can be acquired or lost by it; it neither bestows nor extinguishes any right, and may be successfully assailed whenever it is offered as the foundation for the assertion of any claim or title. * * * Such a judgment has been characterized as a dead limb upon the judicial tree, which may be chopped off at any time, capable of bearing no fruit * * * but constituting a constant menace * * *.'" *Lamarche v. Lamarche*, 115 R.I. 472, 474–75, 348 A.2d 22, 23 (1975) (quoting 1 Freeman, *Judgments* § 322 at 643–44, 645 (5th ed. 1925)).

## Conclusion

Our review of the record supports the Family Court justice's decision that the defendant failed to prove a sufficient change of circumstances from those that existed when the Family Court entered the divorce decree, and we affirm the denial of the defendant's motion to modify placement and/or custody. Because the Family Court lacked jurisdiction over Mrs. Sticca–Guertin, however, we reverse and vacate the provision enjoining the defendant's wife from being involved in the child's pharmacological needs.

We return the papers to the Family Court in the earnest, yet perhaps Polyannaish, hope that these parties will find a way to set aside their animus and begin to cooperate, or at least communicate, in their child's best interests. On a positive note, the trial justice found that the child was doing well at preschool, and seemed to be a happy, healthy child—no doubt a

---

1049 (R.I.1997) (quoting 62B Am. Jur. 2d *Process* § 5 (1990)).

**6.** Although the injunction was entered against Mrs. Sticca–Guertin, a nonparty, and this appeal is pressed by defendant, her husband, "[i]t matters not how, or in what way, or at

what time the objection to [the void order] is brought to the court's attention." *Lamarche v. Lamarche*, 115 R.I. 472, 475, 348 A.2d 22, 23 (1975). "It is the duty of the court to remove the cloud on its own motion whenever it is brought to its attention." *Id.*

testament to the resiliency of youth. Yet we cannot help but express our concern about the toll these continued behaviors are likely to exact upon this young child.

Justice GOLDBERG did not participate.