Daniel J. SHRAMEK

v.

Gina M. SHRAMEK.

No. 2005–83–Appeal.

Supreme Court of Rhode Island.

June 29, 2006.

---

Robert S. Parker, Providence, for Plaintiff.

Gina Shramek, pro se.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

The plaintiff, Daniel J. Shramek, appeals from a Family Court decree distributing the parties' martial assets and awarding a lump-sum alimony payment to the defendant, Gina M. Shramek. Emphasizing the brevity of the marriage and his wife's "negligible" contributions, the plaintiff argues that the trial justice awarded the defendant an excessive share of the marital estate. He also asserts that the trial justice erroneously awarded the defendant a lump-sum alimony payment of $60,000.

This case came before the Supreme Court for oral argument pursuant to an order directing the parties to show cause why the issues raised in this appeal should not be decided summarily. After considering the written and oral submissions of the parties and examining the record, we are of the opinion that the issues raised in this appeal may be resolved without further briefing or argument. For the reasons set forth herein, we affirm the decree of the Family Court.

## Facts and Procedural History

The parties were married on September 8, 2001, in Bermuda. Daniel possessed considerable assets when they married, including a 1999 Audi A4, a retail music business known as Narragansett Disc, Ltd., and the Narragansett Pier commercial property in which the store was located. He also had a significant portfolio before their marriage, including a Charles Schwab account, an IRA account, and a Vanguard account, collectively valued at more than $5 million. Daniel said that Gina asked him "how much [he] was worth" and whether he was a "trust fund baby" before they wed. Gina said that she and Daniel discussed his finances only so that she could assure herself that she was marrying someone who was as hardworking and financially stable as she was.

Each party owned a home before the marriage. Daniel owned a home on Rodman Street and Gina owned a home on Old Boston Neck Road, both in Narragansett, Rhode Island. Shortly after their marriage, as part of an overall estate plan, Daniel executed a quitclaim deed changing the title to his Rodman Street home into a tenancy by the entirety in both of the parties' names. He said that Gina re-

quested that he change the title soon after their honeymoon and that she paid no consideration for the transaction. According to Daniel, he changed the title so that the property would pass to Gina upon his death.

Gina, on the other hand, testified that she did not ask Daniel to add her name to the deed. She said that she originally wanted Daniel to move into her house and that she told him she would put the title to that property in both their names. She testified that Daniel persuaded her to move into his Rodman Street home instead, promising her that he would put her name on the title and fix it up until they could find a new home together. She testified that the couple looked into buying a new home during their marriage. Daniel denied that they seriously considered buying a new home. Gina also said that when she sold her home to move in with Daniel, the proceeds of the sale were placed into a trust fund in her name only.

According to Daniel, only minor improvements were made on the Rodman Street property during their marriage. He also admitted, however, that Gina's stepfather, Fred Brooks, helped to renovate the house on "several occasions." Gina testified that she and Mr. Brooks did extensive work on the home, including cleaning appliances, remedying a flood problem in the basement, painting, adding lighting fixtures, fixing a stairway, refurbishing closets, removing a moldy waterbed, sealing the walls and floors, adding shelving in the garage, repairing the deck, and redoing the yard. Mr. Brooks corroborated his stepdaughter's testimony concerning the work they did on the home. He said that he was not compensated for his work, but that the couple reimbursed him for materials. Both Gina and Mr. Brooks testified that Daniel did little to assist in these improvements. In addition,

Gina brought most of the furniture from her old home and purchased other items to redecorate the parties' marital domicile. Gina testified that she also did most of the housework, yard work, and cooking while she and Daniel lived in the Rodman Street home. Daniel said, however, that he did a great deal of housework, weekly yard work, and most of the cooking.

Gina was a tenured teacher at Chariho High School before she married Daniel, earning $60,000 per year, plus benefits. She testified that she resigned from this teaching position on August 31, 2001, at Daniel's request, because he wanted her to be free to travel and said that he could take care of her financially. She said that she enjoyed her job, had a good rapport with her students and colleagues, and only had a few conflicts with the school's administration, which did not constitute the motive for her resignation. Carol Raheb, Gina's mother, also testified that Gina did not want to quit and had told her that she was resigning because Daniel wanted her to be free to travel with him. Another witness, Kerri Lariviere, an elementary school teacher who was a friend of Gina's, also testified that Gina loved her job and the students, had won awards for being a good teacher, and was not dissatisfied with her position at Chariho High School. Ms. Lariviere said that Gina similarly had told her that she resigned only to comply with Daniel's wishes.

Daniel testified that he only "suggested" that Gina quit teaching because she was "upset" with her job. He said that he assured her that they could afford for her to find another job that would make her happier. Teresa Tanzi, an acquaintance of the couple for four years, testified that before the parties married, although Gina enjoyed her students and was excited about teaching, she did have problems with the school's administration and was hoping

to resign. Karri Thorkildsen, an employee of Daniel's music store, testified that Gina had told her that she wanted to resign because she "couldn't stand" teaching, the students seemed uninterested, and she was tired of the administration's "politics." Daniel further testified that in early 2002, when Gina decided that she wanted to pursue a career teaching yoga instead, he paid for her certification class and was "fully supportive."

In the summer of 2002, when Daniel was in Florida dealing with his father's estate, his wife informed him that she found a location for the yoga studio that she wished to open. Daniel testified that, although he told her not to make an offer on the property until he returned because he thought the price was a little high, Gina made an offer anyway. Gina said that her husband did not tell her that he was uncomfortable with the price and that he knew she was making the offer. The couple paid $95,000 for the commercial condominium from their joint checking account and the property was placed in Gina's name only. Daniel said that he did not object to the sale because it was so close after his father's death that he was not in the proper frame of mind to attempt to avoid the sale after Gina already had made the offer.

Although Daniel testified that the joint checking account was funded primarily by his premarital assets and that Gina contributed money to the account only once or twice, Gina suggested that she made more significant contributions to the account, including wedding gifts and her earnings from a part-time teaching job at the Community College of Rhode Island. Gina also testified that she inherited a beach cabana and $10,000 from her uncle during the marriage, and that she believed that Daniel deposited the money portion of the inheritance into the joint account.

In addition, while they were married, the couple purchased two vehicles for Gina's use. The first, a 2001 BMW X5, was purchased for $41,000. Two vehicles that Gina already owned at the time were traded in toward the purchase of the BMW. The balance due after the trade-ins was $19,000, which the couple paid out of their joint checking account. Gina testified that the second vehicle, a 2002 Porsche Boxster, was given to her by Daniel as a Valentine's Day gift in 2002. Daniel, however, said that he paid the Porsche's purchase price of $42,000 from his premarital assets contained in the joint checking account and that the car was not a Valentine's Day gift.

Daniel testified that as early as the summer of 2002, the couple experienced marriage problems. He said that he tried to improve things by relinquishing other commitments to spend more time with Gina and take her on vacations. In addition, the couple sought marriage counseling from two separate therapists. Daniel also testified that as of the date of trial, the collective balance on the various accounts he possessed before marriage had declined by more than $300,000. In addition, he said that his music store was scheduled to close on April 15, 2004, because of declining sales.

Gina indicated that at the time of trial, her yoga studio was operating at a loss, but that she also was making $200 per month as a part-time yoga instructor at another health club. She said that she would have taken over her mother's wig shop, but Daniel did not like the idea because it would interfere with his travel plans. Daniel denied this assertion. Finally, Gina said that she was actively looking for a teaching job at the time of trial, although at the time to no avail.

The trial justice issued a bench decision on October 14, 2004. After finding that

the parties indeed had irreconcilable differences that justified granting each a divorce, the trial justice determined which assets were part of the marital estate. She decided that the marital estate included the Rodman Street marital domicile, the commercial condominium that housed Gina's yoga studio, the joint checking account, the various household furnishings and effects, the BMW, the Porsche Boxster, and Daniel's Audi. The trial justice further determined that several items were excluded from the marital estate, including a premarital commercial property in Daniel's name that had appreciated in value during the marriage but to which Gina made no contributions, the account in Gina's name that held the proceeds from the sale of her home, a business account in the name of Gina's yoga business, and any other accounts held by either party individually.

In distributing the marital estate, the trial justice considered the factors set forth in G.L.1956 § 15–5–16.1. Among other findings, the trial justice said that Gina was not necessarily the "golddigger" that Daniel had portrayed her to be, but rather that both parties' conduct contributed equally to the marriage's breakdown. The trial justice awarded Gina 35 percent of the value of the Rodman Street property, 35 percent of the commercial condominium housing her yoga studio, and the two vehicles purchased for her use during the marriage. She awarded Daniel the remainder of the marital estate, including the Audi and the money in the joint checking ac-

count. In addition, the trial justice granted Gina a lump-sum alimony award of $60,000, payable "forthwith." Daniel was also obligated to maintain a health plan for Gina's benefit until September 2006, after which time Gina would be responsible for her own health coverage. A decision pending entry of final judgment was entered on November 23, 2004, and Daniel filed a notice of appeal on December 10, 2004.

### Distribution of the Marital Estate

■■■■ On appeal, Daniel first argues that the trial justice erroneously awarded Gina an excessive share of the marital estate. "It is well settled in this jurisdiction that trial justices responsible for equitably distributing property in a divorce action must engage in a three-step process." *Horton v. Horton,* 891 A.2d 885, 889 (R.I.2006). "The trial justice first must determine which assets are marital property, then must consider the factors set forth in § 15–5–16.1(a), and finally, he or she must distribute the property." *Koutroumanos v. Tzeremes,* 865 A.2d 1091, 1096 (R.I.2005). "This Court will not disturb a trial justice's findings of fact in a divorce action unless he or she has 'misconceived the relevant evidence or was otherwise clearly wrong.'" *Horton,* 891 A.2d at 888 (quoting *Koutroumanos,* 865 A.2d at 1097). In making his or her findings, the trial justice must "scrupulously consider[ ] all of the elements set forth in * * * § 15–5–16.1." *Tarro v. Tarro,* 485 A.2d 558, 560 (R.I.1984).[1]

---

1. In Rhode Island, the assignment of property upon divorce is governed by the factors listed in G.L.1956 § 15–5–16.1(a):

"(1) The length of the marriage;

"(2) The conduct of the parties during the marriage;

"(3) The contribution of each of the parties during the marriage in the acquisition,

preservation, or appreciation in value of their respective estates;

"(4) The contribution and services of either party as a homemaker;

"(5) The health and age of the parties;

"(6) The amount and sources of income of each of the parties;

"(7) The occupation and employability of each of the parties;

In the present case, Daniel asserts that the trial justice erred in awarding 100 percent of the BMW and Porsche automobiles to Gina in light of the fact that he contributed $61,000 toward the combined purchase price of $83,000. He asserts that the trial justice's failure to award him any interest in the vehicles because she found his contributions to be gifts was in direct derogation of § 15–5–16.1(b), which specifies, *inter alia,* that gifts from a third party to either spouse before, during, or after the term of the marriage may not be assigned as part of an equitable distribution of marital property. Daniel contends that the vehicles he purchased for his wife were not gifts from third parties and thus should not have been "excluded from the calculus of the marital estate."

■ This argument fails for two reasons. First, it is clear from the record that the trial justice did not exclude the two vehicles from the marital estate, but rather included them in her overall list of marital assets. This was a proper exercise of the trial justice's discretion because the equitable distribution statute specifically excludes only three types of property from the marital estate, including gifts from third parties as Daniel contends, but does not limit a trial justice's authority to award property given by one spouse as a gift to the other. *See* § 15–5–16.1(b).

■ Second, we are satisfied that the trial justice properly considered the awards of the BMW and Porsche to Gina in light of the overall awards assessed to each spouse and the factors set forth in § 15–5–16.1(a). As to the BMW, the evidence was uncontradicted that the couple purchased it partially by trading in the two vehicles that Gina already owned at the time and that the balance was paid out of the couple's joint checking account. The trial justice was satisfied that the "monies in that account more properly belong to the [p]laintiff," yet she found that Daniel provided the $19,000 balance of the BMW's purchase price as a gift to Gina with no expectation of repayment. In light of this factual finding, the trial justice did not abuse her discretion in awarding the BMW to Gina.

■ Similarly, we cannot say that the trial justice abused her discretion in finding that the Porsche was a gift to Gina. The parties' testimony conflicted concerning whether the vehicle was given to Gina by Daniel as a Valentine's Day gift. However, "[i]n a trial without a jury, credibility determinations are within the sound discretion of the trial justice." *Guertin v. Guertin,* 870 A.2d 1011, 1020 (R.I.2005). We will not disturb such determinations unless the trial justice overlooked or misconceived material evidence or was clearly wrong. *Id.* Here, the trial justice, who had an opportunity to hear from both Gina and Daniel on the subject of the Porsche, found that the car was picked up on Valentine's Day, which fact the trial justice considered to be an indication that the car was intended to be a gift. Affording this determination of credibility the proper deference, we cannot say that the trial justice

"(8) The opportunity of each party for future acquisition of capital assets and income;

"(9) The contribution by one party to the education, training, licensure, business, or increased earning power of the other;

"(10) The need of the custodial parent to occupy or own the marital residence and to use or own its household effects taking into account the best interests of the children of the marriage;

"(11) Either party's wasteful dissipation of assets or any transfer or encumbrance of assets made in contemplation of divorce without fair consideration; and

"(12) Any factor which the court shall expressly find to be just and proper."

was clearly wrong in awarding the Porsche to Gina.

Next, Daniel challenges the trial justice's award to Gina of an interest in the marital domicile. He argues that he had no intention of giving Gina an interest in the Rodman Street home when he placed her name on the deed and that, even if the home had become marital property by such action, the award to Gina of 35 percent of the property was excessive. Daniel contends that he placed Gina's name on the deed only for estate planning purposes and that his intent was to transfer an interest to Gina only upon his death.

■ In *Quinn v. Quinn*, 512 A.2d 848, 852 (R.I.1986), this Court held that: "When, during the course of a marriage, title to property for which one spouse has paid the purchase price is acquired in the names of both spouses, the transaction is presumed to be a gift or advancement for the benefit of the other spouse." This "doctrine of transmutation" coincides with the recognition of marriage as a partnership by permitting a change in the character of property from separate to marital when an actual intention to do so is objectively manifested. *Id.* "A transfer of non-marital assets from one spouse to both spouses jointly, in the absence of clear and convincing evidence to the contrary, will be understood as evincing an intention to transfer the property to the marital estate." *Id.*

■ In the present case, Daniel testified that he transferred his individually owned Rodman Street home to a tenancy by the entirety with Gina so that it would pass to her if he died first. He said that Gina provided no consideration for the transfer. However, the trial justice accepted the testimony of Gina and her stepfather indicating that she contributed significantly to the renovation of the marital home and did her share of chores, even including those

household tasks "usually and generally assigned to the male member of the partnership." In addition, the trial justice found that Gina resigned from her job at Chariho High School and sold her home to live in the Rodman Street home at the request of Daniel. The trial justice viewed these findings as consideration for the transfer. Accordingly, she held that the Rodman Street property was a marital asset, and awarded Gina 35 percent of its fair-market value.

We are satisfied that, pursuant to our holding in *Quinn,* and affording the trial justice's credibility determinations and findings of fact the proper deference, the trial justice did not abuse her discretion in awarding Gina 35 percent of the Rodman Street home. As we stated in *Quinn,* "[a]cceptance of the husband's bare assertion that he lacked any donative intent and that he placed the property in joint ownership only for the purpose of convenience would lead to an inequitable result." *Quinn,* 512 A.2d at 853. Acceptance of such a bare assertion would allow the spouse who originally owned the property to defeat the right of the other spouse in the property after he has objectively manifested his intent to make it a joint property by changing the title in the deed. *See id.* Perceiving no clear and convincing evidence to the contrary, we are satisfied that Daniel's transfer of the marital home into a tenancy by the entirety during the marriage evinced an intention to transmute it into marital property.

Daniel's attempt to compare the present case to *Stephenson v. Stephenson*, 811 A.2d 1138, 1140 (R.I.2002), which also involved a marriage of short duration where the husband possessed considerable premarital assets, is unavailing. In *Stephenson,* the Family Court specifically found that the husband did not intend to transfer to his wife a present interest in various

joint bank accounts, but rather added her name merely for convenience in the event that he should predecease her. *Id.* at 1142–43. The trial justice nevertheless concluded that such accounts were part of the marital estate under the doctrine of transmutation. *Id.* at 1143. On appeal, this Court held that the trial justice erred in so ruling because the husband "did not have the requisite intent to create for [his wife] any present possessory interest in the joint accounts." *Id.* In the present case, by contrast, it appears that the trial justice did not accept Daniel's testimony that he transferred the property into joint ownership only for estate planning purposes. Rather, the trial justice specifically found that Gina provided consideration for the transfer by selling her own home "in the interest of the common good." The trial justice also accepted the fact that Gina contributed significantly to the preservation and appreciation of the home by making extensive renovations together with her stepfather.

In addition, even after finding that the home was transferred to joint ownership for the common good of the couple, the trial justice in the present case examined all the variables enumerated in § 15–5–16.1(a) and concluded that Gina was entitled to only 35 percent (rather than 50 percent) of the fair-market value of the Rodman Street home. Contrary to Daniel's contention, before distributing the marital domicile, the trial justice did consider the marriage's brief duration, the conduct of the parties, the contributions of the parties to the home, and the fact that Gina was to retain the proceeds from the sale of her home. Overall, we conclude that the trial justice "scrupulously considered" the factors enumerated in § 15–5–16.1(a) before distributing any of the parties' assets. *See Tarro,* 485 A.2d at 560. She engaged in a thoughtful and thorough review of the evidence presented by both parties in light of those factors. We therefore hold that the trial justice did not abuse her discretion in distributing the marital domicile or any of the assets determined to be part of the marital estate.

## Award of Alimony

Finally, Daniel argues that the trial justice's award of alimony to Gina was excessive because it ignored the fact that substantial assets were assigned to her from the marital estate, the fact that the marriage was very brief, and the fact that Gina was able to "flit[ ] from job to job in search of occupational self-actualization" during the marriage because her husband provided her with a "financial featherbed." He also asserts that the trial justice never made a finding of need. In addition, Daniel argues that the lump-sum award of $60,000 to be paid "forthwith" ignores the possibility that Gina may remarry at any time. To support his argument that a lump-sum payment was unfair, he points to § 15–5–16(c)(2), which says that the obligation to pay alimony shall automatically terminate upon the remarriage of the spouse receiving alimony.

 "Alimony is a rehabilitative tool intended to provide temporary support until a spouse is self-sufficient, and is based purely on need." *Berard v. Berard,* 749 A.2d 577, 581 (R.I.2000). Section 15–5–16(b)(1) sets forth four factors that the court "shall consider" in determining the amount of alimony to be paid: "(i) [t]he length of the marriage; (ii)[t]he conduct of the parties during the marriage; (iii)[t]he health, age, station, occupation, amount and source of income, vocational skills, and employability of the parties; and (iv)[t]he state and the liabilities and needs of each of the parties." With respect to the parties' relative needs, the statute goes on to list a number of factors that the court shall consider in determining "[t]he extent to

which either party is unable to support herself or himself adequately." Section 15–5–16(b)(2)(ii).[2] "As long as the trial justice considers the statutory elements in § 15–5–16, we will not disturb an alimony award on appeal." *Hogan v. Hogan*, 822 A.2d 925, 928 (R.I.2003).

 In this case, the trial justice considered the appropriate factors in deciding to award alimony. In particular, the trial justice observed that the marriage was "very brief," that Gina was "a woman accomplished in several fields," and that she left her position as a high school teacher and sold her home at her husband's request. The trial justice also found that Daniel was able to pay the lump-sum amount of $60,000. In addition, she properly considered that Gina's share of the marital assets would result in her receiving approximately $104,500 in cash, as well as her yoga condominium that had no mortgage "and against which [equity Gina] could borrow if she had to." Based on these variables, the trial justice awarded Gina "one payment of $60,000, which is basically one year of the former salary she made prior to the marriage." Because the trial justice considered the statutory elements that were relevant in this case, we

will not disturb her decision to award alimony to Gina.

 Furthermore, we conclude that awarding alimony to Gina in the form of a lump-sum payment was not error. Section 15–5–16 does not explicitly prohibit one lump-sum award. Moreover, while this Court has not had occasion to consider whether a lump-sum payment is appropriate for an alimony award, we have said that "[a]limony should be 'payable for a short, but specific and terminable period of time, which will cease when the recipient is, in the exercise of reasonable efforts, in a position of self-support.'" *Thompson v. Thompson*, 642 A.2d 1160, 1164 (R.I.1994) (quoting *Casey v. Casey*, 494 A.2d 80, 83 (R.I.1985)). In addition, both the General Assembly and this Court have made clear that alimony may be awarded even for an indefinite period as long as the trial justice considers all the statutory factors. Section 15–5–16(c)(2); *e.g.*, *Wrobleski v. Wrobleski*, 653 A.2d 732, 734 (R.I.1995). In light of this, we cannot say that the trial justice was wrong in awarding Gina one payment of $60,000 from her husband. We believe that the trial justice properly considered the statutory factors and the rehabilitative nature of alimony in determining that Gina needed a very temporary

2. These additional factors include:

"(A) The extent to which a party was absent from employment while fulfilling homemaking responsibilities, and the extent to which any education, skills, or experience of that party have become outmoded and his or her earning capacity diminished;

"(B) The time and expense required for the supported spouse to acquire the appropriate education or training to develop marketable skills and find appropriate employment;

"(C) The probability, given a party's age and skills, of completing education or training and becoming self-supporting;

"(D) The standard of living during the marriage;

"(E) The opportunity of either party for the future acquisition of capital assets and income;

"(F) The ability to pay of the supporting spouse, taking into account the supporting spouse's earning capacity, earned and unearned income, assets, debts, and standard of living; [and]

"(G) Any other factor which the court expressly finds to be just and proper." Section 15–5–16(b)(2)(ii).

In addition, we note that § 15–5–16(b)(2)(i) of the statute says that the court shall take into account the extent to which either party is unable to support herself or himself because that party is the primary custodial parent of a child. This factor is irrelevant in the present case because the parties had no children.

award until she was able to become self-supportive.

## Conclusion

For the reasons stated herein, we affirm the decree of the Family Court and remand the record in this case to that court.